## UNITED STATES v. GOLDMAN et al.
### No. 177.

Circuit Court of Appeals, Second Circuit.

March 10, 1941.

Writ of Certiorari Denied June 2, 1941.

See 61 S.Ct. 1111, 85 L.Ed. ——.

John T. Cahill, U. S. Atty., of New York City (Bruno Schachner and John C. Walsh, Asst. U. S. Attorneys, both of New York City, of counsel), for appellee.

Harold H. Corbin, of New York City (Edward J. Bennett and Francis B. Delehanty, Jr., both of New York City, of counsel), for Martin M. Goldman.

Martin Conboy, of New York City (Martin Conboy and David Ash, both of New York City, of counsel), for Theodore Goldman.

Phillips, Mahoney & Fielding, of New York City (Warren C. Fielding, of New York City, of counsel), for defendant Schulman.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The appellants were indicted in the Southern District of New York, for conspiring, contrary to the provisions of 18 U.S.C.A. § 88, to commit an offense against the United States by receiving or attempting to obtain money for acting or forbearing to act in a bankruptcy proceeding in violation of 11 U.S.C.A. § 52, sub. b. After trial by jury in that court, they were all convicted and sentenced. This appeal followed.

The appellants seek reversal of the judgment on the ground that error was committed in denying their motion to dismiss and later to set aside the verdict for insufficiency of the evidence; and also rely upon errors in the denial of a motion to suppress evidence; in the introduction of evidence; and the denial of a motion to inspect memoranda made by witnesses for the government.

The evidence was clearly sufficient to make a prima facie case as follows:

One Hymowitz, who was the proprietor of a small drygoods store on the Bowery in New York City, was convicted of some

offense relating to the use or possession of relief tickets issued by the City of New York and was imprisoned. His mother and sister engaged Robert Hoffman, an attorney and distant relative, to undertake to settle his business affairs with his creditors. They both had claims against Hymowitz for loans made him but were willing to waive them to further an effort to settle in a way sufficiently satisfactory to the merchandise creditors to enable Hymowitz to go back into business when he had served his sentence.

Hoffman saw Hymowitz in prison and obtained his signature to a general assignment for the benefit of creditors, dated March 22, 1937, under which one Kolman, a lawyer associated with Hoffman, was the assignee. Hoffman then was retained by the assignee and the assignment proceedings were begun in the state court. A letter was sent to all creditors explaining the financial situation of Hymowitz. It was estimated, as therein stated, from information obtained from him and from an appraisal that the cost of his stock in trade was from $2,200 to $2,500; that there were Emergency Relief Bureau Vouchers on which about $250 could be realized and that "the City is also indebted to Paul Hymowitz in the further sum of approximately $200 in connection with other relief vouchers." The liabilities were given as about $2,500 and the co-operation of creditors was asked in aid of a stated "purpose to see that a thorough and proper administration is had and that creditors shall realize as close to one hundred per cent of their claims as possible."

The assignee engaged an auctioneer and made arrangements to hold a public sale of the property at the store of the assignor on April 5, 1937, after due notice given.

That sale was never held, however, because the appellants acted in concert to prevent it in the following way: Martin M. Goldman, who was a partner in the law firm of Goldman, Malter and Goldman in New York City and in which his brother Theodore Goldman another appellant was a partner, arranged with Hoffman in behalf of a creditor who was a client of his firm for a meeting of creditors on the afternoon of March 25, 1937 at the offices of the Dry Goods & Furnishings Association of which one Kandell, a defendant whose motion to dismiss was granted, was in charge.

At about 1 o'clock on that afternoon and before the meeting of creditors was to be held Theodore Goldman and Kandell called at the office of Hoffman where they met him and one Wishbow, the auctioneer who was to conduct the sale for the assignee, and proposed that blank forms they had brought along be executed to make Kandell a co-assignee and retain Goldman as co-attorney for the assignees. Hoffman was unwilling to consent though pressed to do so to avoid the possibility of the assignment proceedings being made abortive by the filing of an involuntary petition in bankruptcy and to make everything go smoother as creditors might feel that Hoffman and the assignee were too closely connected with the debtor to represent them adequately. Hoffman explained that it was a small matter which needed no additional attorney or assignee and persisted in his refusal.

The meeting of the creditors was held later that afternoon with some present; some represented by Kandell; and some by Martin M. Goldman. Hoffman explained the situation and asked the creditors to cooperate. Goldman advocated a private bulk sale of the goods and apparently all but Hoffman and Wishbow agreed. During the meeting Hoffman and Wishbow were asked to withdraw while further discussion was had and while they were in another room Martin M. Goldman joined them and told them that he would like to make some money out of it; that he could arrange to have a buyer, either he or Kandell would obtain, purchase the goods in bulk at private sale who would pay enough to allow for a 40% settlement with creditors and for some expenses and in addition some $400 to be kept secret and divided among Kandell, Goldman and Hoffman. Hoffman did not agree and when he suggested to Goldman that the creditors at the meeting would not accept a settlement at such a percentage, Goldman said they would each get $10 to "shut their mouths."

This proposal to Hoffman, not being accepted, Martin M. Goldman, Theodore Goldman and Schulman decided that an involuntary petition in bankruptcy should be filed and the proposed sale by the assignee stayed. Theodore Goldman then prepared an involuntary petition using a blank form and making only general allegations of acts of bankruptcy which left the petition demurrable and subject to dismissal, if no motion to amend was made, merely upon motion without notice to creditors other than those petitioning. Schulman was

made the attorney of record for the petitioning creditors.

A stay of the assignee's sale was obtained ex parte and served upon Hoffman on the morning of April 5th, the day the sale was to be held. He moved to vacate the stay but his motion was denied after a hearing the same morning before the district judge who issued the stay order, Schulman having appeared with creditors in opposition. After the hearing Hoffman went to the office of a referee in bankruptcy and told the referee what he thought the defendants were trying to do. The referee called in a representative of the Federal Bureau of Investigation to whom Hoffman explained the situation and thereafter Hoffman acted under the instructions of the Bureau. He pretended to be willing to "do business" with Schulman and at a meeting on April 7, 1937 in Schulman's office at which Martin M. Goldman was present the matter was discussed. Meanwhile the Federal Bureau of Investigation had been informed of the time and place of that meeting and had been permitted by the custodian of the building to enter Schulman's office without his knowledge and to install a dictaphone with an outlet in an adjoining vacant room. Representatives of the Bureau were in that adjoining room to record the conversation at the meeting of Schulman, Martin M. Goldman and Hoffman, but the dictaphone didn't work and they were able to get only such fragments of the talk as could be heard through a detectaphone they placed against the side of the wall separating the room they were in from Schulman's office and which was wholly inside the room they were in. This was an instrument in no way connected with the dictaphone above mentioned.

At this meeting Martin M. Goldman took Hoffman to task for his attitude at the hearing before the district judge on the motion to vacate the stay and denied that he had made any improper proposal regarding the disposition of the proceeds of a bulk sale which he insisted was best for creditors. Schulman, attempting to bring Goldman and Hoffman to a better understanding, took the ground that Hoffman's inexperience in such matters accounted for his attitude and the situation was discussed at some length without a definite agreement. At this point Goldman left Schulman's office and Schulman followed him outside. After a little while Schulman came back and told Hoffman that Goldman was afraid to speak before him but that he would carry out whatever Schulman and Hoffman "agreed upon or arranged." Thereupon, Hoffman pretended to acquiesce reluctantly to Schulman's plan to sell the goods in bulk to a buyer who would pay enough to settle with creditors on a 40% basis; leave a small amount for expenses and provide about $400 to be kept secret and divided among Schulman, the Goldmans and Hoffman after some disclosed expenses had been paid. After Hoffman left, Schulman was heard by the government agents in a conversation with someone over the telephone to say in part, "I'm in a position now, I control * * *. Between you and me, he wanted to give creditors 80 cents on the dollar, so there was no room for the boys. So we dumped in on it. Do you understand? The reason I tell you is this. He had two or three men of his own, his auctioneer, that wanted to give him eighteen hundred to two thousand, you understand? Now Goldy even said it would bring sixteen hundred. Goldman is smart. He says he'd bring twelve hundred and sixteen hundred understand? So figuring when he told me somebody had raised it to two thousand and wanted to give it to him at the figure, I figured Goldman would get thirty-three hundred for it, but as it is now take another look and tell me. You don't have to. If we can get a few dollars for ourselves—the result is three * * *."

Schulman and Hoffman conferred several times afterwards and came to an apparent understanding about the bulk sale, and reached the point where Hoffman on April 26th delivered to Schulman a bill of sale of the goods from Hymowitz to one L. Wein in which the consideration was stated to be $1,200 and no mention was made of the relief tickets.

Meanwhile Theodore Goldman prepared a motion to dismiss the petition in bankruptcy which he had drawn and Schulman had filed as attorney for the petitioning creditors and sent it to Hoffman. Hoffman signed it as attorney for the bankrupt and the petition was dismissed on that motion on May 14, 1937 without opposition.

On May 19, 1937, Theodore Goldman sent Hoffman a copy of the order of dismissal of the bankruptcy petition and three papers which he asked Hoffman to have Hymowitz sign and then return. One was a bill of sale of the goods from Hymowitz

to A. Rothhein for the stated price of $1,500. Another was a letter from Hymowitz to Goldman, Malter & Goldman authorizing them to make the sale when the general assignment proceedings were dismissed and to use the proceeds "together with the monies due me from the City of New York" to pay all creditors 40% of their claims except the City Sales Tax Bureau which was to be paid in full and then to "pay all administration expenses, legal fees and disbursements in connection with the bankruptcy proceedings and the assignment for the benefit of creditors." The letter renounced all claim of Hymowitz to any "portion of this money" and authorized Kolman "to turn over to you any monies in his possession as assignee to be used for the purposes hereinabove mentioned." And the third was an assignment from Hymowitz to Goldman, Malter and Goldman of all sums due or to become due the former "in connection with Emergency Relief Bureau Vouchers, issued by the City of New York, and or the Emergency Relief Bureau, which vouchers were heretofore turned over to Paul Hymowitz."

Steps were also taken to get the consent of creditors to the proposed settlement but the whole plan was frustrated by the refusal of a creditor to give a release in full for the percentage offered. This creditor took legal action which did away with the proposed bulk sale and resulted in a sale of the goods at auction by an auctioneer named by that creditor. The proceeds of that sale were all properly applied but the result was a much smaller percentage paid on claims than had previously been contemplated.

■ On such evidence it was clearly for the jury to decide whether the appellants had acted in good faith as they claimed solely for the best interests of the creditors or whether they had fraudulently planned to compel Hoffman under threat of the bankruptcy proceedings to let them control the situation; create a secret fund and divide that in violation of the statute as the government's evidence and especially that of Hoffman, would prove if believed and we must now take it for granted that it was believed by the jury. There was, accordingly, ample proof of the conspiracy and the evidence connecting the appellants in the scheme was plainly adequate. Tomplain v. United States, 5 Cir., 42 F.2d 202. What Schulman said and did in further-

ance of the conspiracy was competent evidence not only against himself but against the others and admissible as to them in the exercise of a sound discretion by the trial court. Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462; Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L. Ed. 269.

■ Nor was any error committed in denying Schulman's motion, in which the Goldmans did not join, to suppress the evidence obtained by government agents by the use of the detectaphone and allowing it to be introduced at the trial. Nothing was obtained as a result of any secret entry of Schulman's office. No trespass upon his premises in any way helped to obtain the evidence. The situation was legally no different from the use of an amplifier of sound to overhear conversation not otherwise audible to the listener as for instance, the use of a common aid to hearing by a person somewhat deaf. No communication by wire or radio was intercepted to make applicable the provisions of Sec. 605 of the Communications Act of 1934, c. 652, 48 Stat. 1064, 1103, 47 U.S. C.A. § 605, as construed in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. There was only an instance of eavesdropping which alone, though an invasion of privacy, is not a violation of a recognized legal right to privacy. Conspirators who discuss their unlawful schemes must take the risk of being overheard and the risk of having what is overheard used against them provided there is otherwise no trespass by the listener or violation of a statutory right to use a means of communication thus made immune from interception. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376. Compare, United States v. Feldman, 3 Cir., 104 F.2d 255; and Smith v. United States, 4 Cir., 2 F.2d 715.

■■ Federal agents who testified had made minutes of occurrences concerning which they gave evidence and had read over their minutes in preparing to testify at the hearing on the motion to suppress evidence. None of them used such notes to refresh his memory when on the stand either at the preliminary hearing or at the trial. A motion by appellants for the delivery to them of such notes for inspection was denied both at the hearing on the motion and at the trial and exceptions were

taken. Memoranda actually used by a witness when testifying may be examined by opposing counsel if a request so to do is made. Morris v. United States, 5 Cir., 149 F. 123, 126, 9 Ann.Cas. 558. Where an attorney has made use of grand jury minutes in the examination of a witness the court may, nevertheless, in the exercise of a sound discretion deny a request of opposing counsel to inspect them. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 233, 234, 60 S.Ct. 811, 84 L.Ed. 1129. Where the witness neither uses memoranda when testifying nor use of it is made by counsel in his examination there is ordinarily no danger, and there certainly was none here, that the witness when on the stand will either be imposed upon in that respect or receive any improper communication or that there are hidden circumstances which might detract from the weight of his testimony of which opposing counsel should be made aware and given the opportunity to expose. The reasons underlying the rule permitting inspection not being applicable, it was not error to deny the appellants' motion. Lennon v. United States, 8 Cir., 20 F.2d 490; Mullaney v. United States, 9 Cir., 82 F.2d 638; C. W. Hull Co. v. Marquette Cement Mfg. Co., 8 Cir., 208 F. 260.

No other grounds for reversal have been advanced which are of sufficient merit to require discussion.

Judgment affirmed.