GOLDMAN *v.* UNITED STATES.*

No. 962, October Term, 1940.   Argued February 5, 6, 1942.—Decided April 27, 1942.

---

*Together with No. 963, October Term, 1940, *Shulman* v. *United States,* and No. 980, October Term, 1940, *Theodore Goldman* v. *United States,* also on writs of certiorari, 314 U. S. 701, to the Circuit Court of Appeals for the Second Circuit.

Mr. *Osmond K. Fraenkel* for petitioners, and Mr. *Jacob W. Friedman* for petitioners in Nos. 962 and 980. Mr. *Jeremiah T. Mahoney* was with them on the briefs.

*Solicitor General Fahy,* with whom *Assistant Attorney General Berge* and *Messrs. Richard H. Demuth, Oscar A. Provost, Richard S. Salant, Henry J. Fox,* and *Louis B. Schwartz* were on the brief, for the United States.

Briefs were filed by *Messrs. Abraham J. Isserman* and *Nathan Witt,* on behalf of the National Federation for Constitutional Liberties, and by Mr. *Thomas H. Eliot,* as *amici curiae,* urging reversal.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The petitioners and another were indicted for conspiracy[1] to violate § 29 (b) (5) of the Bankruptcy Act[2] by receiving, or attempting to obtain, money for acting, or forbearing to act, in a bankruptcy proceeding. They were convicted and sentenced, and the judgments were affirmed by the Circuit Court of Appeals.[3] The facts are fully stated in the opinion below and we shall advert only to those essential to an understanding of the questions open in this court.

The petitioners were lawyers. One of them, Martin Goldman, approached Hoffman, the attorney representing

---

[1] Criminal Code § 37; 18 U. S. C. § 88.

[2] 11 U. S. C. § 52 (b) (5).

[3] 118 F. 2d 310.

an assignee for the benefit of creditors, with the proposition that the assignee sell the assets in bulk for an ostensible price which would net the creditors a certain dividend, but in fact at a secret greater price, and that Hoffman and the petitioners should divide the difference between them. Hoffman refused. Shulman, one of the petitioners, then filed an involuntary petition in bankruptcy against the assignor, in such form that it could be dismissed on motion and without notice, and obtained a stay of the assignee's sale. The bankruptcy court refused to revoke the stay, and Shulman again approached Hoffman stating that, if he agreed to the proposed arrangement, the bankruptcy petition could be dismissed and the plan consummated. Hoffman said he would agree, but he went at once to the referee and disclosed the scheme. A federal investigator was consulted and it was arranged that Hoffman should continue to negotiate with the petitioners. He did so. Numerous conferences were had and the necessary papers drawn and steps taken. Success was frustrated only by the refusal of a creditor to release for the offered percentage of his claim.

Meantime, two federal agents, with the assistance of the building superintendent, obtained access at night to Shulman's office and to the adjoining one and installed a listening apparatus in a small aperture in the partition wall, with a wire to be attached to earphones extending into the adjoining office. This was for the purpose of overhearing a conference with Hoffman, set for the following afternoon. The next afternoon, one of the agents returned to the adjoining room with two others and a stenographer. They connected the earphones to the apparatus but it would not work. They had with them another device, a detectaphone, having a receiver so delicate as, when placed against the partition wall, to pick up sound waves originating in Shulman's office, and means for amplifying and hearing them. With this

the agents overheard, and the stenographer transcribed, portions of conversations between Hoffman, Shulman, and Martin Goldman on several occasions, and also heard what Shulman said when talking over the telephone from his office.

Before the trial, Shulman learned the facts and made a motion, in which the other petitioners joined, to suppress the evidence thus obtained. A preliminary hearing was had and the motion was denied. At the trial, the evidence was admitted over objection that its receipt violated the Fourth Amendment of the Constitution and, as respects Shulman's talk into the telephone receiver, violated also § 605 of the Federal Communications Act.[4]

At the preliminary hearing, and at the trial, counsel for petitioners demanded that they be permitted to inspect the notes and memoranda made by the agents during the investigation, the agents having admitted they had refreshed their recollection from these papers prior to testifying. The trial judge ruled that the papers need not be exhibited by the witnesses.

1. We hold there was no error in denying the inspection of the witnesses' memoranda. The judge was clearly right in his ruling at the preliminary hearing, as the petitioners should not have had access, prior to trial, to material constituting a substantial portion of the Government's case.

We think it the better rule that where a witness does not use his notes or memoranda in court, a party has no absolute right to have them produced and to inspect them. Where, as here, they are not only the witness' notes but are also part of the Government's files, a large discretion must be allowed the trial judge. We are unwilling to hold that the discretion was abused in this case.

---

[4] Act of June 19, 1934, 48 Stat. 1064, 1103; 47 U. S. C. § 605.

2. We hold that the overhearing and divulgence of what Shulman said into a telephone receiver was not a violation of § 605.

The petitioners contend that a communication falls within the protection of the statute once a speaker has uttered words with the intent that they constitute a transmission of a telephone conversation. The validity of the contention must be tested by the terms of the Act fairly construed. So considered, there was neither a "communication" nor an "interception" within the meaning of the Act. The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation. Section 3 embodies the following definition:[5]

"(a) 'Wire communication' or 'communication by wire' means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission."

What is protected is the message itself throughout the course of its transmission by the instrumentality or agency of transmission.[6] Words written by a person and intended ultimately to be carried as so written to a telegraph office do not constitute a communication within the terms of the Act until they are handed to an agent of the telegraph company. Words spoken in a room in the presence of another into a telephone receiver do not constitute a communication by wire within the meaning of the section. Letters deposited in the Post Office are

---

[5] 47 U. S. C. § 153.

[6] Compare *Diamond* v. *United States,* 108 F. 2d 859, 860; *United States* v. *Polakoff,* 112 F. 2d 888, 890.

protected from examination by federal statute,[7] but it could not rightly be claimed that the office carbon of such letter, or indeed the letter itself before it has left the office of the sender, comes within the protection of the statute. The same view of the scope of the Communications Act follows from the natural meaning of the term "intercept." As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver.[8] The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication, within the meaning of the Act, than would have been the overhearing of the conversation by one sitting in the same room.

3. We hold that what was heard by the use of the detectaphone was not made illegal by trespass or unlawful entry.

The petitioners' contend that the trespass committed in Shulman's office when the listening apparatus was there installed, and what was learned as the result of that trespass, was of some assistance on the following day in locating the receiver of the detectaphone in the adjoining office, and this connection between the trespass and the listening resulted in a violation of the Fourth Amendment. Whatever trespass was committed was connected with the installation of the listening apparatus. As respects it, the trespass might be said to be continuing and, if the apparatus had been used it might, with reason, be claimed that the continuing trespass was the concomi-

[7] *Ex parte Jackson*, 96 U. S. 727.

[8] *United States* v. *Yee Ping Jong*, 26 F. Supp. 69, 70.

tant of its use. On the other hand, the relation between the trespass and the use of the detectaphone was that of antecedent and consequent. Both courts below have found that the trespass did not aid materially in the use of the detectaphone. Since we accept these concurrent findings, we need not consider a contention based on a denial of their verity.

4. We hold that the use of the detectaphone by Government agents was not a violation of the Fourth Amendment.

In asking us to hold that the information obtained was obtained in violation of the Fourth Amendment, and that its use at the trial was, therefore, banned by the Amendment, the petitioners recognize that they must reckon with our decision in *Olmstead* v. *United States,* 277 U. S. 438. They argue that the case may be distinguished. The suggested ground of distinction is that the *Olmstead* case dealt with the tapping of telephone wires, and the court adverted to the fact that, in using a telephone, the speaker projects his voice beyond the confines of his home or office and, therefore, assumes the risk that his message may be intercepted. It is urged that where, as in the present case, one talks in his own office, and intends his conversation to be confined within the four walls of the room, he does not intend his voice shall go beyond those walls and it is not to be assumed he takes the risk of someone's use of a delicate detector in the next room. We think, however, the distinction is too nice for practical application of the Constitutional guarantee, and no reasonable or logical distinction can be drawn between what federal agents did in the present case and state officers did in the *Olmstead* case.

The petitioners ask us, if we are unable to distinguish *Olmstead* v. *United States,* to overrule it. This we are unwilling to do. That case was the subject of prolonged consideration by this court. The views of the court, and

136

of the dissenting justices, were expressed clearly and at length. To rehearse and reappraise the arguments pro and con, and the conflicting views exhibited in the opinions, would serve no good purpose. Nothing now can be profitably added to what was there said. It suffices to say that we adhere to the opinion there expressed.

The judgments are

*Affirmed.*

MR. CHIEF JUSTICE STONE and MR. JUSTICE FRANKFURTER:

Had a majority of the Court been willing at this time to overrule the *Olmstead* case, we should have been happy to join them. But as they have declined to do so, and as we think this case is indistinguishable in principle from *Olmstead's*, we have no occasion to repeat here the dissenting views in that case with which we agree.

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE MURPHY, dissenting:

I cannot agree, for to me it is clear that the use of the detectaphone under the circumstances revealed by this record was an unreasonable search and seizure within the clear intendment of the Fourth Amendment.

One of the great boons secured to the inhabitants of this country by the Bill of Rights is the right of personal privacy guaranteed by the Fourth Amendment. In numerous ways the law protects the individual against unwarranted intrusions by others into his private affairs.[1] It compensates him for trespass on his property or against his person. It prohibits the publication against his will

---

[1] See generally, Brandeis and Warren, "The Right to Privacy," 4 Harv. L. Rev. 193 (1890).

of his thoughts, sentiments, and emotions, regardless of whether those are expressed in words, painting, sculpture, music, or in other modes.[2] It may prohibit the use of his photograph for commercial purposes without his consent.[3] These are restrictions on the activities of private persons. But the Fourth Amendment puts a restraint on the arm of the Government itself, and prevents it from invading the sanctity of a man's home or his private quarters in a chase for a suspect, except under safeguards calculated to prevent oppression and abuse of authority.

On the value of the right to privacy, as dear as any to free men, little can or need be added to what was said in *Entick* v. *Carrington*, 19 How. St. Tr. 1030, *Boyd* v. *United States*, 116 U. S. 616, and Mr. Justice Brandeis' memorable dissent in *Olmstead* v. *United States*, 277 U. S. 438, 471. Suffice it to say that the spiritual freedom of the individual depends in no small measure upon the preservation of that right. Insistence on its retention does not mean that a person has anything to conceal, but means rather that the choice should be his as to what he wishes to reveal, saving only to the Government the right to seek out crime under a procedure with suitable safeguards for the protection of individual rights, such as the warrant whose requisites are set forth in the Fourth Amendment.

---

[2] *Ibid.*, pp. 198–199.

[3] See *Pavesich* v. *New England Life Ins. Co.*, 122 Ga. 190, 50 S. E. 68; *Bazemore* v. *Savannah Hospital*, 171 Ga. 257, 155 S. E. 194; *Kunz* v. *Allen*, 102 Kan. 883, 172 P. 532; *Foster-Milburn* v. *Chinn*, 134 Ky. 424, 120 S. W. 364; *Munden* v. *Harris*, 153 Mo. App. 652, 134 S. W. 1076; *Flake* v. *Greensboro News Co.*, 212 N. C. 780, 195 S. E. 55; *Holloman* v. *Life Ins. Co. of Virginia*, 192 S. C. 454, 7 S. E. 2d 169. Cf. *Henry* v. *Cherry & Webb*, 30 R. I. 13, 73 A. 97; *Hillman* v. *Star Publishing Co.*, 64 Wash. 691, 117 P. 594; *Atkinson* v. *John E. Doherty & Co.*, 121 Mich. 372; 80 N. W. 285; *Jones* v. *Herald Post Co.*, 230 Ky. 227, 18 S. W. 2d 972; *O'Brien* v. *Pabst Sales Co.* 124 F. 2d 167. See also § 51 of the New York Civil Rights Law.

It will be conceded that if the language of the Amendment were given only a literal construction, it might not fit the case now presented for review. The petitioners were not physically searched. Their homes were not entered. Their files were not ransacked. Their papers and effects were not disturbed. But it has not been the rule or practice of this Court to permit the scope and operation of broad principles ordained by the Constitution to be restricted, by a literal reading of its provisions, to those evils and phenomena that were contemporary with its framing. Cf. *Weems* v. *United States,* 217 U. S. 349, 373; *United States* v. *Classic,* 313 U. S. 299, 316.

The conditions of modern life have greatly expanded the range and character of those activities which require protection from intrusive action by Government officials if men and women are to enjoy the full benefit of that privacy which the Fourth Amendment was intended to provide. It is our duty to see that this historic provision receives a construction sufficiently liberal and elastic to make it serve the needs and manners of each succeeding generation. Cf. *Grau* v. *United States,* 287 U. S. 124, 128, and cases cited. Otherwise, it may become obsolete, incapable of providing the people of this land adequate protection. To this end we must give mind not merely to the exact words of the Amendment, but also to its historic purpose, its high political character, and its modern social and legal implications.

With the passing of the years since 1787, marked changes have ensued in the ways of conducting business and personal affairs. Many transactions of a business or personal character that in the eighteenth century were conducted at home are now carried on in business offices away from the home. If the method and habits of the people in 1787 with respect to the conduct of their private business had been what they are today, is it possible to think that the framers of the Bill of Rights would have been

any less solicitous of the privacy of transactions conducted in the office of a lawyer, a doctor, or a man of business, than they were of a person's papers and effects? [4]

There was no physical entry in this case. But the search of one's home or office no longer requires physical entry, for science has brought forth far more effective devices for the invasion of a person's privacy than the direct and obvious methods of oppression which were detested by our forebears and which inspired the Fourth Amendment.[5] Surely the spirit motivating the framers of that Amendment would abhor these new devices no less. Physical entry may be wholly immaterial.[6] Whether the search of private quarters is accomplished by placing on the outer walls of the sanctum a detectaphone that transmits to the outside listener the intimate details of a private conversation, or by new methods of photography that penetrate walls or overcome distances, the privacy of the citizen is equally invaded by agents of the Government and intimate personal matters are laid bare to view. Such

---

[4] Papers taken from an office in the course of an unreasonable search are taken in violation of the Fourth Amendment. *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385; *Gouled* v. *United States*, 255 U. S. 298; *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344; *United States* v. *Lefkowitz*, 285 U. S. 452.

[5] Those devices were the general warrants, the writs of assistance and the *lettres de cachet*.

On the subject of the general warrant, see *Entick* v. *Carrington*, 19 How. St. Tr. 1030, and May, Constitutional History of England (2d ed.), vol. III, pp. 1–10.

For an account of the writs of assistance, see Quincy (Mass.) 51 (1761) and Gray's appendix to Quincy's Reports. See also Tudor, James Otis, p. 66, and John Adams, Works, vol. II, p. 524.

The *lettres de cachet* are discussed in Chassaigne, Les Lettres de Cachet sous L'ancien Regime (Paris, 1903).

[6] "It is not the breaking of his [man's] doors, and the rummaging of his drawers, that constitutes the essence of the offence"—those are but "circumstances of aggravation." *Boyd* v. *United States*, 116 U. S. 616, 630.

invasions of privacy, unless they are authorized by a warrant issued in the manner and form prescribed by the Amendment, or otherwise conducted under adequate safeguards defined by statute, are at one with the evils which have heretofore been held to be within the Fourth Amendment, and equally call for remedial action.[7]

On the basis of the narrow, literal construction of the search and seizure clause of the Fourth Amendment adopted in *Olmstead* v. *United States*, 277 U. S. 438,[8] Gov-

---

[6] A warrant can be devised which would permit the use of a detectaphone. Cf. Article 1, § 12 of the New York Constitution (1938). And, while a search warrant, with its procedural safeguards has generally been regarded as prerequisite to the reasonableness of a search in those areas of essential privacy, such as the home, to which the Fourth Amendment applies (see *Agnello* v. *United States*, 269 U. S. 20, 32), some method of responsible administrative supervision could be evolved for the use of the detectaphone which, like the valid search warrant, would adequately protect the privacy of the individual against irresponsible and indiscriminate intrusions by Government officers. See Wigmore, Evidence (3d ed.), vol. 8, § 2184b, pp. 51–2.

While the detectaphone is primarily used to obtain evidence, and while such use appears to be condemned by the rulings of this Court in *Gouled* v. *United States*, 255 U. S. 298, and *United States* v. *Lefkowitz*, 285 U. S. 452, I am not prepared to say that this purpose necessarily makes all detectaphone "searches" unreasonable, no matter what the circumstances, or the procedural safeguards employed. Cf. *Marron* v. *United States*, 275 U. S. 192. See Wigmore, Evidence (3d ed.), vol. 8, §§ 2251, 2264; 31 Yale L. J. 518, 522; Chafee, Progress of the Law, 1919–1922, 35 Harv. L. Rev. 673, 699; 32 Col. L. Rev. 386; Cooley, Constitutional Limitations (8th ed.), vol. 1, p. 625.

[8] The *Olmstead* case limits the search and seizure clause to "an official search and seizure of his [defendant's] person or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house 'or curtilage' for the purpose of making a seizure." 277 U. S. 438, 466.

The decisions of this Court prior to the *Olmstead* case insisted on a liberal construction of the Fourth Amendment and placed within its compass activities bearing slight, if any, resemblance to the mis-

ernment officials could well believe that activities of the character here involved did not contravene the Constitutional mandate. But for my part, I think that the *Olmstead* case was wrong. The error of the stultifying construction there adopted is best shown by the results to which it leads. It is strange doctrine that keeps inviolate the most mundane observations entrusted to the permanence of paper but allows the revelation of thoughts uttered within the sanctity of private quarters, thoughts perhaps too intimate to be set down even in a secret diary, or indeed, utterances about which the common law drew the cloak of privilege—the most confidential revelations between husband and wife, client and lawyer, patient and physician, and penitent and spiritual adviser. Nor can I see any rational basis for denying to the modern means of communication the same protection that is extended by the Amendment to the sealed letter in the mails. See *Ex parte Jackson,* 96 U. S. 727. Officers conducting an unreasonable search are seeking evidence as such; the form it takes is of no concern to them.

But even if *Olmstead's* case is to stand, it does not govern the present case. It was not the intention of petitioners to project their conversations beyond the walls of petitioner Shulman's private office.[9] Whatever may be said of a wire-tapping device that permits an outside telephone conversation to be overheard, it can hardly be doubted that the application of a detectaphone to the walls of a home or a private office constitutes a direct invasion of the privacy of the occupant, and a search of his private quarters.

---

chiefs known at the time of its adoption. See *Boyd* v. *United States,* 116 U. S. 616; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298.

[9] It also appears that the Government agents overheard Shulman's end of some outside telephone conversations.

142

The circumstance that petitioners were obviously guilty of gross fraud is immaterial. The Amendment provides no exception in its guaranty of protection. Its great purpose was to protect the citizen against oppressive tactics. Its benefits are illusory indeed if they are denied to persons who may have been convicted with evidence gathered by the very means which the Amendment forbids. Cf. *Weeks* v. *United States,* 232 U. S. 383. Its protecting arm extends to all alike, worthy and unworthy, without distinction. Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men as to afford no aid to the best of men in time of need.

The benefits that accrue from this and other articles of the Bill of Rights are characteristic of democratic rule. They are among the amenities that distinguish a free society from one in which the rights and comforts of the individual are wholly subordinated to the interests of the state. We cherish and uphold them as necessary and salutary checks on the authority of government. They provide a standard of official conduct which the courts must enforce. At a time when the nation is called upon to give freely of life and treasure to defend and preserve the institutions of democracy and freedom, we should not permit any of the essentials of freedom to lose vitality through legal interpretations that are restrictive and inadequate for the period in which we live.