**UNITED STATES of America,**
**Plaintiff,**

v.

**Frank COSTELLO, Defendant.**

United States District Court
S. D. New York.

Oct. 23, 1956.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City, for United States, Alfred P. O'Hara, Earl J. McHugh and Edwin J. Wesely, Asst. U. S. Attys., New York City, of counsel.

Hays, St. John, Abramson & Heilbron, New York City, for defendant.

894

Edward Bennett Williams, Washington, D. C., for defendant, Robert Cole, New York City, of counsel.

PALMIERI, District Judge.

The Government brought this action to cancel defendant's citizenship on the ground of illegality and fraud in its procurement in violation of the Nationality Act of 1906, June 29, 1906, c. 3592, § 4, 34 Stat. 596.* On the first day of trial, defense counsel moved to strike the affidavit of good cause, which is a prerequisite to a denaturalization proceeding, United States v. Zucca, 1956, 351 U.S. 91, 76 S.Ct. 671; United States v. Costello, D.C.S.D.N.Y.1956, 142 F.Supp. 290, and to dismiss the complaint on the ground that three of the four sources relied on by the affiant of good cause were replete with information culled from wire taps.[1] The fourth source, described as a Central Office file of the Immigration and Naturalization Service, was kept secret from the defendant.[2] Since I was unwilling to delay this frequently postponed trial any longer,[3] and since the Assistant United States Attorney vigorously denied any use of wire taps,[4] I took the motion under advisement and adjured the Assistant United States Attorney to notify me whenever he had reason to believe that his evidence stemmed from wire taps.[5] The prosecution accepted this responsibility and the trial continued.[6]

Two days later, the Government called defendant Costello to the stand.[7] Almost immediately, defense counsel objected to questions seeking to elicit evidence of violations of the National Prohibition Act, 27 U.S.C.A. § 1 et seq., claiming, with the support of an affidavit, that the prosecutor's questioning was suggested to him by clues gleaned from intercepted telephone conversations.[8] Although the Assistant United States Attorney maintained that wire taps were not employed,[9] I felt that it was no longer possible to delay a disposition of this issue. Accordingly, I suspended the trial and, together with counsel, examined three of the four sources relied on by the affiant who swore to good cause—namely, the hearings of the Special Committee of the United States Senate to Investigate Organized Crime which took place in 1950 and 1951, the minutes of the Second September 1943 Grand Jury of New York County, and the transcript of the disciplinary bar proceedings conducted before the Hon. Charles B. Sears—well over a thousand pages in all.[10] The fourth source, even at this late date of trial, was kept secret from me and from the defendant.[11]

Although Government counsel advised me that the affiant of good cause based his information on only a few undisclosed pages in these voluminous records,[12] I found that the three sources contained indications of the extensive use of wire taps covering a period of many years and beginning in the 1920's. My belief as to this tainted quality was confirmed by telephone conversations with two men who had personal knowledge of taps on telephone lines during the 1920's in connection with an indictment returned against the defendant and many others for violations of the National Prohibition

* Now 8 U.S.C.A. § 1421 et seq.

1. Record pp. 8–10.

2. Record p. 36.

3. See minutes of June 5, 1956.

4. Record pp. 33–37.

5. Record p. 38.

6. Record p. 39.

7. Record p. 186. The Government's right to call the defendant as a witness was vigorously disputed. I have filed a written opinion, dated September 26, 1956, overruling defendant's claim of privilege under the Fifth Amendment, notwithstanding some serious misgivings. United States v. Costello, D.C.S.D.N.Y.1956, 144 F.Supp. 779.

8. Record pp. 189, 191, 193, 195, 204, 206.

9. Record pp. 190, 210, 214, 216–17, 218, 219, 226, 236–37.

10. Record pp. 240, 260.

11. Record pp. 260–61, 280.

12. Record pp. 229, 268.

Act.[13] The information found in the aborted proceedings surrounding this indictment appears to be inextricably interwoven with other wire tap information appearing in the three sources with which we are concerned.

Once the defendant has shown that a substantial part of the Government's case is built on wire tap evidence, the Government must prove that its evidence has an independent and untainted origin. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; United States v. Coplon, 2 Cir., 1950, 185 F.2d 629, 28 A.L.R.2d 1041, certiorari denied, 1952, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688; Coplon v. United States, 1951, 89 U.S.App.D.C. 103, 191 F.2d 749, certiorari denied, 1952, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690; United States v. Goldstein, 2 Cir., 1941, 120 F.2d 485, 488, affirmed, 1942, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (dictum). Government counsel sought to satisfy this burden by proposing a hearing after a short adjournment.[14] However, the record clearly indicated that it would take extensive proof to segregate untainted sources, and an adjournment and hearing promised an undue disruption of the trial and the consumption of considerable time.

Under the circumstances, I thought it would be fairer both to the Court and the defendant to have the Government start anew.[15] Furthermore, the record was confused as to the relative importance and extent of the information gleaned by the Government from wire tapping performed before and after the passage of the Federal Communications Act of 1934, 48 Stat. 1103, 47 U.S.C. 605 (1952), 47 U.S.C.A. § 605. Moreover, it was not certain whether or not some of defendant's admissions contained in the report of the Senate Committee hearings were induced by confronting him with such information long after the passage of the Act. If the 1925–1926 wire taps were, as I believed, the initial step of a continuous pattern of wire tap investigation and scrutiny of this defendant by federal and state law enforcement agencies, can they be considered as separable from the post 1934 wire taps and deemed admissible as evidence in a federal court? I thought not. In any event, it was impossible for me to make rulings of law against a concrete set of facts.[16] See

---

13. One of them, a former Assistant United States Attorney, participated in the prosecution, and his identity was furnished upon my request by counsel for the Government. The other, a former detective of the New York City Police Department, was identified by a former Government investigator and proved to be the person who actually took care of the technical details of numerous wire taps used in that case. The former Assistant subsequently sent me an affidavit which I made a part of the record (Court's Ex. 5).

The Government objected that it had no opportunity to cross-examine these persons. But I was faced with a situation where, from the record, I had no choice except to believe that the evidence was probably tainted. In the absence of any discrediting evidence adduced by the Government, I tried to test defendant's claim. I was, in effect, taking up the Government's burden. See Record pp. 262–63; see Nardone v. United States and cases cited with it, *infra*. Nevertheless, the information in the record was

sufficient, and my conclusion was based upon it. See Record p. 264.

14. Record pp. 264, 273, 281.

15. Record p. 271.

16. The issues that might have been presented go to the basis of federal criminal detection and trial procedure and have overtones of federal-state relationships. Should a federal court go beyond an admission exacted by what is apparently legal state procedure to express approval or disapproval of that procedure for purposes of allowing the admission to go into the record? Does the proscription of § 605 against the use of intercepted messages refer to all intercepted messages or only to those intercepted after 1934? Cf. Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. Which of the policies underlying the present proscription against intercepting and divulging telephonic conversations apply to messages intercepted before 1934? Can a past indictment which integrated legally gather-

Hart & Wechsler, The Federal Courts and the Federal System 78–79 (1953). Since I was reluctant to make hypothetical rulings, I ordered the case dismissed without prejudice to the Government's suing again on the very same grounds. The dismissal was made contingent upon the defendant's stipulating that he would raise no objection, upon a new trial, to the Government's re-alleging the same grounds for denaturalization. This he has done.[17] Furthermore, if the case is renewed, the Government and its affiant are to be specific as to the exact sources of their information and their freedom from taint.

■ I do not believe that the Government is justified in asserting that the defendant waived his objections with respect to wire tap evidence. It appears that defendant's counsel did not evaluate the possibility of taint until shortly before the trial began. While he earlier had studied the hearings of the Senate Committee to Investigate Organized Crime, and these contained many hints of wire tapping,[18] he did not examine the Grand Jury minutes or the disciplinary bar proceedings until a week before trial.[19] More important, he was never shown the Central Office file [20] and never really knew the exact sources of information upon which the affiant of good cause relied.[21] In addition, the Assistant United States Attorney's adamant insistence to the very last moment of the trial that his evidence did not stem from wire taps is hardly consistent with his claim that the defendant should be held to have waived any objection to them.[22]

ed evidence be rendered presently inadmissible by looking through that indictment to find that the evidence was subsequently proscribed?

While these questions can be framed even on this confused record, the undistilled quality of the facts suggests that several hidden variations and modifications are possible. These questions are therefore not ripe for decision. See Communist Party v. Subversive Activities Control Board, 1956, 351 U.S. 115, 76 S.Ct. 663.

17. Record p. 269.

18. Record p. 10.

19. Record pp. 9–10.

20. See notes 2 and 11, *supra*.

21. See note 12, *supra*. On page 36 of the record, the Assistant United States Attorney suggests that the Central Office file offers conclusive proof that the Government's evidence is not based on wire tapping. On page 37, he suggests that defense counsel could have seen this well before trial if he were really interested in a wire tapping objection. The Assistant United States Attorney, however, never had authority to reveal the contents of this file. See note 11, *supra*.

The sources other than the Central Office file had been made available to prior defense counsel in accordance with a stipulation which reserved to the defendant the right to object to their admission in evidence except on grounds of authenticity. The defendant's present counsel entered the case a relatively short time before trial. The trial date was fixed only after considerable difficulty due to his repeated requests for time to prepare the case, and to the assertions of ill health by the defendant, who was incarcerated during the entire period. The defendant's incarceration raised problems regarding the adequacy of his opportunity to consult with counsel, particularly in view of the voluminous pre-trial records. These circumstances are relevant to the question of waiver. Even under less compelling circumstances, I should be reluctant to permit a well founded allegation of waiver to become decisive of the defendant's rights in a case of this nature where such a heavy criterion of proof is exacted of the Government. Cf. Knauer v. United States and cases cited with it, *infra*.

22. Record pp. 272, 273, 274, 279, 280. Compare Record p. 36 with Record p. 280:

Pp. 36–37—Court asks Assistant United States Attorney (hereinafter Government counsel) "to state whether or not each one of these sources of information (i. e., those upon which the affidavit of good cause was based) was developed by the use of intercepted telephone messages:

"The stark issue of rudimentary morality in criminal prosecutions"—to which a denaturalization proceeding is akin, Cf. Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796—"should not be lost in [a] melange of \* \* \* issues \* \* \*. And the importance of thus vindicating the scrupulous administration of justice as a continuing process far outweighs the disadvantage of possible delay in the ultimate disposition of this case." Cf. Mesarosh v. United States, 352 U.S. 808, 77 S.Ct. 14, 16 (opinion of Frankfurter, J. on Government's motion to remand). "\* \* \* Fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." Cf. Communist Party v. Subversive Activities Control Board, 1956, 351 U.S. 115, 124, 76 S.Ct. 663.

Accordingly, the case is dismissed without prejudice to the Government's initiating it anew on the very same grounds. An order to that effect is filed herewith.

"Gov't Counsel: I answered the question. I said no, your Honor.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Court: Then your statement is in direct conflict with the assertions made by Mr. Williams (defense counsel).

"Gov't Counsel: No, it isn't.

"Court: Well, in what respect is it not?

"Gov't Counsel: In this respect, your Honor. Mr. Williams said that the three sources he referred to were the two Aurelio hearings (i. e., Grand Jury and Disciplinary Bar Proceedings) and the Kefauver (i. e., Senate) hearings. Then he referred to an investigative report (i. e., the Central Office file). Now I know Mr. Williams did not indicate what evidence is in that, because he couldn't, he has never seen it."

Record p. 280:

"Gov't Counsel: (In the process of offering into evidence at the very end of the trial allegedly untainted sources of evidence): Also your Honor noted that you had not been permitted to see the confidential file upon which the affidavit was based (i. e., the Central Office file).

"Court: I so noted. Do you deny it?

"Gov't Counsel: No. I want the record to show that I am under the interdiction by the Attorney General not to produce it, that I am asked under that order to apply to the Court for a reasonable adjournment in order that the permission of the Attorney General may be obtained, that I asked for that adjournment yesterday for one day until Monday and that it was denied.

"Court: Your application for an adjournment is denied. You should have had full authority to deal with the papers in this case before you started the trial and not ask me to interrupt the trial until you get more authority. It is astounding to me that you can try the case on the basis of a document referred to as a source of the affidavit of good cause and keep it from the scrutiny of the Court."