**UNITED STATES of America,**
**Plaintiff,**

v.

**Jimmy Gary MARTIN, Harold James Cutno, Melvin Jones and Clifford John. Woods.**

**Crim. No. 29234.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 8, 1963.

John C. Ciolino, Asst. U. S. Atty., New Orleans, La., for the Government.

Leon D. Hubert, Jr., and Robert Zibilich, New Orleans, La., for defendant Martin.

Milton P. Macinter, New Orleans, La., for defendant Cutno.

Bernard A. Horton, New Orleans, La., for defendant Jones.

Adolph J. Levy, New Orleans, La., (court appointed), for defendant Woods.

FRANK B. ELLIS, District Judge.

This case involves the most important quarter inch in privacy today. More specifically, the question is whether a motel room heater panel's removal constitutes an invasion of privacy. The matter is before the court on defendants' motion to suppress evidence made prior to arraignment.

In mid-July 1963, the Federal Bureau of Narcotics obtained information that narcotics were available somewhere along Shrewsbury Road in Jefferson Parish, Louisiana, just outside New Orleans. Checking on possible locations, agent Douglas E. Chandler called Mr. Ellis L. Marsalis, Sr., owner and operator of the Marsalis Mansion Motel, 110 Shrewsbury Road, on July 16, 1963. During their conversation Mr. Marsalis indicated that he had reason to believe the occupants of Room # 7 were engaged in illegal activity. Later that afternoon Mr. Marsalis

emptied the wastebasket from Room # 7 and saved the contents. The same evening he showed those contents to agents Chandler and Fritz J. Engelking. Among the debris were empty capsules believed to have once contained heroin. Thereupon Mr. Marsalis admitted the agents to Room #6 and they began their vigil.

The physical arrangement of the rooms is such that #6 and #7 have one common party wall. Built into this common wall is a dual "Sunair" gas heating unit, designed to warm both rooms. Near the base of this unit is a control panel which lifts out by using a finger in a hole manufactured for that purpose. The Unit as a whole protrudes into each room a few inches. With the panel in place one cannot see into the adjoining room; with the panel removed some vision and hearing is possible. During their vigil the agents removed the panel in Room #6. The corresponding panel in Room #7 had already been removed by some unknown person

After the agents had waited about an hour defendants Martin and Cutno arrived in Room #7, followed five minutes later by defendants Jones and Woods. Through the space in the common wall where the heating unit was located the agents overheard a conversation among the four defendants concerning the price of heroin, discussion of a place for its concealment, and mention of the involvement of other persons in the narcotics trade. They also overheard a long-distance telephone call to a person apparently their supplier, saw defendant Jones inhale what appeared to be heroin, saw the counting and concealment of capsules appearing to contain heroin, and saw the counting of money. When Jones and Woods started to leave the agents intercepted them in the corridor outside Room #7. Jones dropped a bag containing 301 capsules of heroin as he was arrested. Woods escaped by running down the hall and was captured some time later. Martin and Cutno were arrested in Room #7 and a search thereof disclosed other narcotics. No warrant was sought and none obtained.

In narcotics arrests by agents of the Federal Bureau of Narcotics the absence of a warrant is not fatal provided certain ' conditions are met initially. These requirements are expressed in Monroe v. United States, 320 F.2d 277 (5 Cir.1963):

> "The Narcotic Control Act of 1956, 26 U.S.C. § 7607 (1957), specifically provides that agents of the Federal Bureau of Narcotics are authorized to make arrests without warrants for violations of the narcotics laws where the violations are *committed in their presence* or where they have *reasonable grounds to believe that the person arrested is in the process of committing an offense* against the laws of the United States relating to narcotic drugs. Draper v. United States, (1959) 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Espinoza v. United States, (5th Cir. 1960) 278 F.2d 802." (Emphasis supplied)

Applying this test to the facts recited above, the agents did not need a warrant since they had reasonable grounds to believe that a narcotics offense was being committed, if not "committed in their presence." However, these grounds and this presence were effected only through the removal of the heater panel, so that if the removal was an invasion of privacy the "fruit of the poisonous tree" doctrine espoused in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1938) would preclude use of the evidence obtained incident to these arrests.

The parties in this action contend that different tests should be applied to the facts in determining whether an invasion of privacy has been perpetrated. The government's position is that a rule of technical trespass must be applied; defendants argue for a more abstract rule disassociated from and independent of a trespass on the premises. For convenience this latter rule will be hereafter referred to as the "pure invasion" test. In order to determine the proper rule this court must analyze the landmark Supreme Court cases on the matter. Olm-

stead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) summarizes the jurisprudence preceding that decision. The case involved the admissibility of wiretap evidence which, among other things, was obtained in violation of a Washington Statute and admitted in a federal prosecution. The majority opinion written by Mr. Chief Justice Taft indicated that under Common law rules the evidence was admissable. One of the considerations which led to this result was the lack of an actual trespass, and hence the Court found no violation of the Fourth Amendment.

"The insertions were made without trespass upon any property of the defendants. They were made in the basement of the large office building. The taps from house lines were made in the streets near the houses." 277 U.S. 457, 48 S.Ct. 565, 72 L.Ed. 944.

Mr. Justice Brandeis, one of the four dissenters, argued for a test more in line with what this court terms the "pure invasion" test. He advocated the abandonment of strict rules emanating from the antiquity of the Common Law where those rules did not square with modern principles of justice.

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizens." 277 U.S. at 485, 48 S.Ct. at 575, 72 L.Ed. 944.

In this limited area of wiretap evidence the dissenting views were given credence through the Federal Communications Act of 1934, 48 Stat. 1064, but the general proposition was not affected.

Fourteen years after the decision in Olmstead the Supreme Court had occasion to consider a different aspect of privacy invasion. In Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L. Ed. 1322 (1942) federal agents employed an electronic device known as a detectaphone to overhear conversations in an adjoining room. The device there used, the detectaphone, need only be placed against the wall to amplify sounds transmitted through the wall. Mr. Justice Roberts' opinion refused to overrule Olmstead, and instead followed the technical trespass rule, finding that there had been no penetration and hence no trespass.

The dissents in Goldman picked up where Mr. Justice Brandeis left off in Olmstead. Mr. Chief Justice Stone and Mr. Justice Frankfurter merely expressed agreement with the dissents in Olmstead. Mr. Justice Murphy for the dissent held:

"There was no physical entry in this case. But the search of one's home or office no longer requires physical entry, for science has brought forth far more effective devices for the invasion of a person's privacy than the direct and obvious methods of oppression which were detested by our forebears and which inspired the Fourth Amendment. Surely the spirit motivating the framers of that Amendment would abhor these new devices no less. Physical entry may be wholly immaterial. Whether the search of private quarters is accomplished by placing on the outer walls of the sanctum a detectaphone that transmits to the outside listener the intimate details of a private conversation, or by new methods of photography that penetrate walls or overcome distances, the privacy of the citizen is equally invaded by agents of the Government and intimate personal matters are laid bare to view. Such invasions of privacy, unless they are authorized by a warrant issued in the manner and form prescribed by the Amendment, or otherwise conducted under adequate safeguards defined by statute, are at one with the evils which have heretofore been held to be within the Fourth Amendment, and equally call for remedial action." 316 U.S. at 139–40, 62 S.Ct. at 998, 86 L.Ed. 1322.

The dissenter's expression is clearly a call for application of the "pure invasion" test.

Next we come to Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.

Ed.2d 734 (1961). Here the line of distinction was sharpened down to the fraction of an inch. In the Silverman case federal agents inserted a "spike mike" into the common party wall of two buildings until the spike came in contact with a metal heating duct, thus converting the entire heating system into a conductor of sound. A conviction obtained pursuant to evidence so received was affirmed by the Court of Appeals but reversed by the Supreme Court, Mr. Justice Stewart writing the opinion. The opinion pinpoints the difficulty which faced the Court of Appeals where it states:

> "A distinction between the detectaphone employed in Goldman and the spike mike utilized here seemed to the Court of Appeals too fine a one to draw. The court was 'unwilling to believe that the respective rights are to be measured in fractions of inches.'" 365 U.S. at 512, 81 S.Ct. at 683, 5 L.Ed.2d 734.

The opinion then proceeds to add an element of doubt to the apparent application of the technical trespass test:

> "But decision here does not turn upon the technicality of a trespass upon a party wall as a matter of local law. It is based upon the reality of an actual intrusion into a constitutionally protected area." 365 U.S. at 512, 81 S.Ct. at 683, 5 L.Ed. 2d 734.

Those two sentences would appear to lend credence to the argument for application of the "pure invasion" test, and, except for what preceded and followed that language, would govern the case at bar. The end of the same paragraph dispels this doubt though and indicates an adherence to the technical trespass rule:

> "We find no occasion to re-examine Goldman here, but we decline to go beyond it, by even a fraction of an inch." 365 U.S. at 512, 81 S.Ct. at 683, 5 L.Ed.2d 734.

Furthermore, the concurring opinion of Justices Clark and Whittaker affirm this clarification. Their view was that "the unauthorized physical penetration into petitioners' premises constituted sufficient trespass to remove this case from the coverage of earlier decisions * * *." 365 U.S. at 513, 81 S.Ct. at 683, 5 L.Ed. 2d 734.

In a separate concurring opinion Mr. Justice Douglas conceived of the opinion as applying the technical trespass test even though he concurred for different reasons. In essence his thesis followed the pattern established by Mr. Justice Brandeis in Olmstead and remodeled by Mr. Justice Murphy in Goldman. The applicable rule in privacy invasion cases following Silverman thus remained as the technical trespass rule with a clear caveat that any trespass, no matter how small, even to a mere fraction of an inch, would violate constitutional protections.

Even more recently the Supreme Court has tangentially touched on the central problem here. In Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) the defendant complained of constitutional infringements when some of his conversations were recorded by an Internal Revenue Agent to whom he was talking, the agent being in the defendant's place of business. Citing Olmstead, Goldman and Silverman the Court notes that the only guaranty recited by those cases is that "the electronic device not be planted by an unlawful physical invasion of a constitutionally protected area." 373 U.S. at 438–439, 83 S.Ct. at 1387, 1388, 10 L.Ed.2d 462. Dismissing the point summarily the Court recites that "the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment," but that the device "was carried in and out by an agent who was there with petitioner's assent * * *." 373 U.S. at 439, 83 S.Ct. at 1388, 10 L.Ed.2d 462. Clearly then the majority was basing its decision in part at least on the technical trespass rule.

Again there was a dissenting opinion, this time by Justice Brennan joined in by Justices Douglas and Goldberg. The

gist of their dissent in regards this area of privacy invasion is their call for a broader interpretation of the Fourth Amendment and its disassociation from rules of trespass. In short they contend "that Olmstead was erroneously decided." 373 U.S. at 458, 83 S.Ct. at 1398, 10 L.Ed.2d 462.

■ However often this argument for the "pure invasion" rule has been invoked it still remains as a minority view in the eyes of the Supreme Court. However persuasive its logic when taken alone, the logic of the majority loomed stronger. Hence this court must adopt the rule employed by the highest court in the land, and in the case at bar apply the technical trespass rule. Moreover, as indicated above there is considerable jurisprudence not only on what rule is to be applied, but also as to what constitutes a trespass under the Fourth Amendment. At present there is little jurisprudence, apart from the aforementioned dissents, that defines either the scope or the detail of a Fourth Amendment invasion under the "pure invasion" rule. As to scope it is not clear whether a motel room would fall on one side of a line or the other. Clearly a home would be protected, but not so clear in the case of an automobile, a telephone booth or a table at a patio cafe. Likewise, guidelines as to what constitutes an invasion are notably absent. The only certainty here is the negative assertion that trespass rules should not be controlling.

■ In applying the technical trespass rule to the case at bar there was no contention that the agents were wrongfully in Room #6 since they had been admitted by the owner of the motel. Cf. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The only serious doubt centers on whether the removal of the heated panel was a trespass. The design and construction of the heating unit required that to ignite the pilot light it was necessary to remove the control panel, and, according to the affidavit of Mr. Marsalis, guests were permitted to perform this function. Since removal of the panel in one instance cannot be a trespass it is difficult to see how it would constitute a trespass in another. Furthermore, the rule applied by the Supreme Court is not grounded on intent; it is distinctly defined in terms of penetration down to the "fraction of an inch." Here there was no penetration even a fraction of an inch further than the agents were entitled to go. And finally, the defendants were required to take the room as they found it, complete with the possibility that someone might remove the heater panel in Room #6 and observe and overhear their conduct.

■ It was also contended that under Louisiana law the agents were guilty of being "Peeping Toms", LSA–R.S. 14:-284, and that for this reason the evidence so adduced should be suppressed. A similar argument was proposed and rejected in Olmstead, and on that authority is rejected here.

This court does not intend to convey the impression that its reasons for denying the herein motion are based on passive submission to the majority will of the Supreme Court, nor should the material quoted above be construed as even tacit approval of the minority views. Instead, this court expressly places itself on the side of effective law enforcement wherein the rights of many are not sacrificed under the guise of protecting the rights of a few who engage in an unlawful enterprise and seek to escape from the tenets of the law by the invocation of some constitutional privilege. A line must be drawn somewhere. If encroachments on the rights of the majority are permitted to continue in the disguise of individual freedom our progeny for generations to come will be denied the protection of effective law enforcement and left prey to the forces of evil operating in contravention of the law. It must not be that constitutional privileges shall be used to "fence all crime with holiness."

Therefore, in light of the foregoing, the defendants' motion to suppress evidence will be denied.

It is so ordered.