Edward W. ANSPACH, Appellant,

v.

UNITED STATES of America,
Appellee.

Walter F. TURNER, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 6720, 6721.

United States Court of Appeals
Tenth Circuit.

June 27, 1962.

For original opinion, see 305 F.2d 48.

Arthur Warner, Los Angeles, Cal. (S. Ward Sullivan, Beverly Hills, Cal., on the brief), for Edward W. Anspach.

John J. Dunn, Denver, Colo., for Walter F. Turner.

Yale Huffman, Asst. U. S. Atty. (Lawrence M. Henry, U. S. Atty., on the brief), for appellee.

Before LEWIS and BREITENSTEIN, Circuit Judges, and RITTER, District Judge.

RITTER, District Judge (dissenting).

When the facts in this case are truly considered, a fair application of established constitutional principles decides the issue in favor of appellants.

The agent overheard an incriminating conversation from an adjoining hotel room. He rented the room for the express purpose of eavesdropping, and to obtain evidence to be used against defendants in a criminal proceeding.

Marshall, the government agent, and Russell, a former employee of Anspach and Turner, made a deal pursuant to which Marshall rented a hotel room, and Russell engaged the adjoining room, in which he arranged a meeting with his former employer, Anspach.

The rooms were connected by double doors, one on either side. The agent opened up the door on his side, sat down close to the other door, and listened through it to the conversation in the next room.

Appellants urge that the Fourth Amendment forbade the introduction of such evidence. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). I think they are right.

The beginning and the end of the discussion, for my part, is Mr. Justice Bradley's opinion in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885), a case, as Justice Brandeis said, "that will be remembered as long as civil liberty lives in the United States."

There, an Act of Congress authorized the District Judge, in a proceeding to forfeit goods alleged to have been imported by means of fraud, to order the defendant to produce his books and papers. It was argued the Act was free from constitutional objection, because it did not authorize the search and seizure of books and papers, but only required the defendant to produce them. Of this, the Supreme Court said: (p. 621, 6 S.Ct. p. 527) "That is so; but it declares that if he does not produce them, the allegations which it is affirmed they will prove shall be taken as confessed. This is tantamount to compelling their production * * *. It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching amongst his papers, are wanting, * * *; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be; because it is a material ingredient, and effects the sole object and purpose of search and seizure."

Again, this is stated at page 635, at page 535 of 6 S.Ct.: "Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it

contains their substance and essence, and effects their substantial purpose. * * * It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

In short, there was no "search" or "seizure" in Boyd in any literal or ordinary sense of the words. The court looked to the results accomplished by the acts of the government agents. The results were the same as if an actual search or seizure had been made: the government agent got the evidence he was after; the defendant was the unwilling source of evidence to convict him. If the acts of the agent "are a material ingredient", "contain the substance and essence", and effect "the sole object and purpose of search and seizure", they are a search and seizure within the scope of the Fourth Amendment to the Constitution.

The Fourth Amendment safeguards against all evils that are like and equivalent to those embraced within the ordinary meaning of its words.

The next subject to which Justice Bradley turned his attention was: what was intended by the use of the word "unreasonable" in relation to searches and seizures?

To show the thrust of events upon the minds and purposes of the statesmen of the day, Justice Bradley takes us to "the contemporary or then recent history of the controversies" that were raging when those amendments were proposed.

General warrants and Star Chamber proceedings in England, writs of assist-ance in the American Colonies, lettres de cachet in France were the particular instruments of tyranny and oppression which were fresh in the memories of those who urged the adoption of the Fourth and Fifth Amendments.

General warrants in England led to Lord Camden's judgment in Entick v. Carrington, 19 Howell's State Trials 1029 (1762); writs of assistance in the American Colonies led to the Fourth and Fifth Amendments; the lettres de cachet in France led to the fury and horror of the French Revolution.

In England, the Crown's Secretary of State issued general warrants, to search any place for any thing, to discover evidence with which to convict the subject of seditious libel. This practice, which was imported by the Star Chamber from the continent, was held invalid in Lord Camden's opinion of which Mr. Justice Bradley says (116 U.S. p. 626, 6 S.Ct. p. 530):

"Lord Camden pronounced the judgment of the court in Michaelmas Term, 1765, and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time.

"As every American statesmen, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the Fourth Amendment to the Constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures."

Similarly, in the American Colonies it was the practice of the Crown to issue

writs of assistance to revenue officers which empowered them, in their discretion, to search suspected places for smuggled goods.

James Otis declared this practice, "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book."

This was true, he said, because it placed "the liberty of every man in the hands of every petty officer."

"This was in February, 1761, in Boston," Justice Bradley relates, "and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' (The works of John Adams, vol. 2, Appendix A, pp. 523–525; vol. 10, pp. 183, 233, 244, 256 &c., and in Quincy's Reports, pp. 469–482.)

"These things, and the events which took place in England immediately following the argument about writs of assistance in Boston, were fresh in the memories of those who achieved our independence and established our form of government."

"Could the men", asks Justice Bradley, at page 630 of 116 U.S., at page 532 of 6 S.Ct., "could the men who proposed those amendments, in the light of Lord Camden's opinion, have put their hands to a law like those [before the court]  *  * ? "

He continues: "It seems to us that the question cannot admit of a doubt. They never would have approved of them. The struggles against arbitrary power in which they had been engaged for more than twenty years, would have been too deeply engraved in their memories to have allowed them to approve of such insidious disguises of the old grievance which they had so deeply abhorred."

That is the question in this, and every other such case arising under the Fourth and Fifth Amendments: Could the men who proposed them have approved "of such insidious disguises of the old grievance which they had so deeply abhorred?"

What would Thomas Jefferson and John Adams have thought about having government agents tap their private telephone wires? And how would they have regarded the narrow, niggardly construction placed on the Fourth Amendment in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928)?

What would they have thought of the supposed distinction between Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), and Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), that an eavesdropping device is all right if it is located outside the victim's house?

And what do you suppose those who won our independence would have thought of an attempt to distinguish the case at bar from Silverman?

What possible relevant distinction is there between a spike driven part way into a party wall and pressed against a heating duct, and the government agent opening up one of two double doors in the party wall, sitting down close to the other door, and listening through it to the conversation in the next room? Hasn't there been an actual penetration into the victim's premises as much in the one case as in the other? But, be that as it may, what has a physical penetration got to do with it anyway? Mr. Justice Douglas in Silverman says: "My trouble with *stare decisis* in this field is that it leads us to a matching of cases on irrelevant facts.  *  *  *  The concept of 'an unauthorized physical penetration into the premises,' on which the present decision rests, seems to me to be beside the point. Was not the wrong in both cases done when the intimacies of the home were tapped, recorded, or revealed?  *  *  * There is in each such case a search that should be made, if at all, only on a warrant issued by a magistrate."

The relevant similarities, on the other hand, in Goldman, Silverman and the case at bar are: that the defendants are compelled to become the unwilling source of evidence to convict them of crime; the government agent is acting wilfully, for the express purpose of eavesdropping and to obtain evidence to be used by the government against the defendants in a criminal proceeding.

The agent is proceeding without a search warrant. He could not obtain a search warrant in these circumstances. The United States Commissioner is powerless to issue one. Such warrant would be in violation of the Fourth Amendment, which reads: "* * *, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Since the decision in Boyd the law has been settled that no court can issue a search warrant authorizing government agents to look for evidence of crime merely with the hope of finding something to convict the victim. A search warrant must describe with particularity the things for which the agents are to search, and these are limited to (1) stolen property, (2) actual instruments of crime, or (3) contraband. Exploratory searches for evidence are forbidden, with or without warrants, by the Fourth Amendment.

One of the causes of the American Revolution was the bitter experience of the colonists with sweeping warrants which authorized the King's officers to search any place for any thing at any time in a hunt for evidence with which to convict the subject of crime. No man's privacy was safe from the prying eyes and ears of every petty official. This is the history and purpose against which the Fourth Amendment must be construed.

Is it not curious that the men who wrote the quite precise safeguards around the issuance of search warrants in the Fourth Amendment should be supposed, in the language of the same sentence, to have intended to open up the door wide, and to place "the liberty of every man in the hands of every petty officer"?

Having searched history, "in order to ascertain the nature of the proceedings intended by the Fourth Amendment to the Constitution under the terms 'unreasonable searches and seizures.'" Mr. Justice Bradley next brings us to the most often quoted passages of his memorable opinion:

"The principles laid down in this opinion (Lord Camden's) affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.

"Can we doubt that when the Fourth and Fifth Amendments to the Constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and 'unreasonable' character of such seizures?"

The very *personal* nature of the right protected by the Fourth Amendment is

emphasized by the Court in Boyd: *"personal* security", *"personal* liberty", *"private* property", "the *sanctity of a man's home"*, and "the *privacies* of life." These are the "very essence of constitutional *liberty* and *security"*, of which the Court speaks.

Entick v. Carrington, supra, in which Lord Camden spoke for the court, arose on a common law declaration for trespass *quare clausum fregit.* But the Supreme Court of the United States in Boyd, says: The principles laid down in Lord Camden's judgment "reach farther than the concrete form of the case then before the court, with its adventitious circumstances * * *. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of · the offence * * *. Breaking into a house and opening boxes and drawers are circumstances of aggravation * * *."

In Boyd, as we have seen, there was no trespass at all. There was no "search and seizure" in any literal or ordinary sense. The statute authorized the District Judge to require the defendant to produce a document in the orderly process of a court's procedure. The court in the plainest of terms says no breaking and entry is necessary to bring the government agent's conduct within the condemnation of the Fourth Amendment.

The principles announced by the court in Boyd "apply to all invasions on the part of the government and its employes of the * * * privacies of life. * * * any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other."

The term "any compulsory extortion" of a man's own testimony, to be used as evidence to convict him of crime, must be understood as meaning much more than the general warrant in Entick v. Carrington, supra, the writs of assistance in Boston, or the legal process in Boyd. The

whole tenor and spirit of the opinion commands it.

The underlying thought and spirit of the court's opinion is, that the government may not make a man an unwilling or involuntary witness against himself in a prosecution for crime. The court says, the principles apply to *"all* invasions on the part of the government * * * of the privacies of life." And further (116 U.S. at page 635, 6 S.Ct. at page 535) the court held that the Fourth and Fifth Amendments must be construed liberally in favor of the citizen to safeguard his personal rights and liberty. "A close and literal construction", says the court, "deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The difficulty with all cases in the area in which the present one falls is Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). It has been on the books for 34 years and the constitutional storm it created has shown no indication of abating. The reason is not far to seek. More than three quarters of a century ago, Mr. Justice Bradley gave it to us in Boyd v. United States, supra: "It is abhorrent to the instincts of an American. * * * [It is] contrary to the principles of a free government. * * * It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

Olmstead was decided by the narrowest margin. Holmes, Brandeis, Butler and Stone dissented. Holmes called wire tapping by police "dirty business" and the government's part in it "ignoble".

Justice Douglas had joined the majority in Goldman. In On Lee v. United States, 343 U.S. 747, 762, 72 S.Ct. 937, 976, 96 L.Ed. 1270 (1942), he dissented and wrote: "I joined in an opinion of the Court written ·by Mr. Justice Roberts, which adhered to the Olmstead case, refusing to overrule it. Since that time

various aspects of the problem have appeared again and again in the cases coming before us. I now more fully appreciate the vice of the practices spawned by Olmstead and Goldman. Reflection on them has brought new insight to me. I now feel that I was wrong in the Goldman case. Mr. Justice Brandeis in his dissent in Olmstead espoused the cause of privacy—the right to be let alone. What he wrote is an historic statement of that point of view."

Justice Black also voted with the majority in Goldman, and with the majority in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), Justice Black concurs in the opinion of the court which overrules the majority view in Wolf v. Colorado, supra, and adopts the approach to the interpretation of our Bill of Rights "well set out by Mr. Justice Bradley in the Boyd case", that constitutional provisions for the security of person and property should be liberally construed. He also adopts Justice Bradley's view of the interrelationship between the Fourth and Fifth Amendments, and his statement that he was "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." (367 U.S. 643, 662, 81 S.Ct. 1684, 1695).

The soul searching since Olmstead, the testing of its doctrine by experience, and the recent course of decision in the United States Supreme Court do not inspire confidence that Olmstead will long endure.[1]

The rationale of that decision is twofold: first, that the protection of the Fourth Amendment against unreasonable searches and seizures applies only to physical, tangible objects, and does not apply to conversations which cannot be seized or searched. Second, that there was no physical entry into the houses or offices of the defendants, that listening to telephone conversations was not a trespass on the defendant's premises.

There is no reliance upon the first rationale of Olmstead in either Goldman or Silverman. Neither decision is based upon the ground that conversations are not protected by the Fourth Amendment. The case against that proposition is most forcefully put in a dissenting opinion by Mr. Justice Murphy in Goldman: "But for my part, I think that the Olmstead case was wrong. The error of the stultifying construction there adopted is best shown by the results to which it leads. It is strange doctrine that keeps inviolate the most mundane observations entrusted to the permanence of paper but allows the revelation of thoughts uttered within the sanctity of private quarters, thoughts perhaps too intimate to be set down even in a secret diary, or indeed, utterances about which the common law drew the cloak of privilege—the most confidential revelations between husband and wife, client and lawyer, patient and physician, and penitent and spiritual adviser. Nor can I see any rational basis for denying to the modern means of communication the same protection that is extended by the Amendment to the sealed letter in the mails. See Ex parte Jackson, 96 U.S. 727 [24 L.Ed. 877]. Officers conducting an unreasonable search are seeking evidence as such; the form it takes is of no concern to them."

In Goldman the majority opinion rests squarely upon the holding in Olmstead that there is no violation of the Fourth Amendment without a physical entry upon the victim's premises. There federal agents had placed an electronic device against the outside wall of an office and listened to conversations inside.

In Silverman the electronic device penetrated part way into a wall and pressed against the victim's heating duct. The

1. By 1942 and Goldman, the only remaining member of the Olmstead court was Chief Justice Harlan Fiske Stone. He, and Justices Frankfurter and Murphy dissented. Justice Jackson took no part.

Justices Black and Douglas joined Justices Roberts, Reed and Byrnes in an adherence to Olmstead and a refusal to overrule it.

court held there was "an unauthorized physical penetration into the premises," and a violation of the Fourth Amendment. Mr. Justice Potter Stewart wrote: "We find no occasion to re-examine Goldman here, but we decline to go beyond it, by even a fraction of an inch." 365 U.S. 505, 512, 81 S.Ct. 679, 683. That statement pretty sharply limits the authority of Goldman that an actual physical entry into the premises is a *sine qua non* to Fourth Amendment protection.

Observe, also, that Silverman *does* protect private conversations. What Chief Justice Taft said of Olmstead fits Silverman like a glove: "Here we have testimony only of voluntary conversations secretly overheard", 277 U.S. 438, 464, 48 S.Ct. 564, 568.

There was no search for "material things" in Silverman. There was no seizure of any physical, tangible "things". (The words quoted are Chief Justice Taft's in Olmstead, 277 U.S. at page 464, 48 S.Ct. 564.)

The court stood 9—0 in Silverman. Can it any longer seriously be contended that conversations are not within the protection of the Fourth Amendment?

In my humble judgment there isn't very much left of Olmstead. One of its premises is knocked out entirely, and the other sharply limited. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), as we shall see, discards Olmstead's narrow, literal approach to the construction of the Fourth Amendment.

The present case is "a fraction of an inch" beyond Goldman. It is indistinguishable from Silverman. I am unwilling to follow what I believe to be the thoroughly discredited doctrine of Olmstead and Goldman, or to extend it in disregard of the authority of Silverman.

The majority in the present case adopt Olmstead's refusal to extend the protection of the Fourth Amendment to the spoken word. That has been overruled in Silverman.

The majority in the present case argue that the Fourth Amendment should not be so construed as to "leave society at the mercy" of those who would destroy our freedoms. And, they say, "The 'pursuit of happiness' referred to by Justice Brandeis in Olmstead can be destroyed by idealistic theory that shuns the deadly realism of crime. We do not consider the conduct of the agents in the case at bar to violate the compulsion of the Fourth Amendment or, indeed, to be even subject to criticism."

Justice Holmes in his dissent in Olmstead, wrote:

"We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

"For those who agree with me, no distinction can be taken between the Government as prosecutor and the Government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed."

In On Lee v. United States, supra, Mr. Justice Frankfurter, dissenting, addressed himself to the subjects thus suggested by the majority here:

"The law of this Court ought not to be open to the just charge of having been dictated by the 'odious doctrine,' as Mr. Justice Brandeis called it, that the end justifies reprehensible means. To approve legally what we disapprove morally, on the ground of practical convenience, is to yield to a short-sighted view of practicality. It derives from a preoccupation with what is episodic and a disregard of long-run consequences. The method by which the state chiefly exerts an influence upon the conduct of its citizens, it was wisely said by Archbishop William Temple, is 'the moral qualities which it exhibits in its own conduct.'

"Loose talk about war against crime too easily infuses the administration of justice with the psychology and morals of war. It is hardly conducive to the soundest employment of the judicial process. Nor are the needs of an effective penal code seen in the truest perspective

by talk about a criminal prosecution's not being a game in which the Government loses because its officers have not played according to rule. Of course criminal prosecution is more than a game. But in any event it should not be deemed to be a dirty game in which 'the dirty business' of criminals is outwitted by 'the dirty business' of law officers. The contrast between morality professed by society and immorality practiced on its behalf makes for contempt of law. * * *

"It is a quarter century since this Court, by the narrowest margin, refused to put wiretapping beyond the constitutional pale where a fair construction of the Fourth Amendment should properly place it. Since then, instead of going from strength to strength in combatting crime, we have gone from inefficiency to inefficiency, from corruption to corruption. * * *

"It is noteworthy that, although this Court deemed wiretapping not outlawed by the Constitution, Congress outlawed it legislatively by the Communications Act of 1934, 48 Stat. 1064, 1103, 47 U.S.C. § 605; Nardone v. United States, 302 U.S. 379 [58 S.Ct. 275, 82 L.Ed. 314]; 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307]. What is perhaps even more noteworthy is its pervasive disregard in practice by those who as law officers owe special obedience to law. What is true of the federal Act against wiretapping and its violations is widely true of related state legislation and its disobedience. See Westin, The Wire Tapping Problem, 52 Col.L.Rev. 165 (1952). Few sociological generalizations are more valid than that lawlessness begets lawlessness.

"The members of this Court who so vigorously urged that wiretapping is within the clear scope of the prohibition of the Fourth Amendment were no sentimentalists about crime or criminals. Mr. Justice Holmes, Mr. Justice Brandeis, Mr. Justice Butler and Mr. Chief Justice Stone were no softies. In all matters of social policy we have to choose, and it was the hardy philosophy of life that his years in the Army of the Potomac taught him that led Mr. Justice Holmes to deem it 'a less evil that some criminals should escape than that the Government should play an ignoble part.' Olmstead v. United States, supra, [277 U.S.] at 470 [48 S.Ct. at 575].

"Suppose it be true that through 'dirty business' it is easier for prosecutors and police to bring an occasional criminal to heel. It is most uncritical to assume that unless the Government is allowed to practice 'dirty business' crime would become rampant or would go unpunished. * * *

"My deepest feeling against giving legal sanction to such 'dirty business' as the record in this case discloses is that it makes for lazy and not alert law enforcement. It puts a premium on force and fraud, not on imagination and enterprise and professional training. The third degree, search without warrant, wiretapping and the like, were not tolerated in what was probably the most successful administration in our time of the busiest United States Attorney's office. This experience under Henry L. Stimson in the Southern District of New York, compared with happenings elsewhere, doubtless planted in me a deep conviction that these short-cuts in the detection and prosecution of crime are as self-defeating as they are immoral.

"Sir James Fitzjames Stephen brings significant testimony on this point:

" 'During the discussions which took place on the Indian Code of Criminal Procedure in 1872 some observations were made on the reasons which occasionally lead native police officers to apply torture to prisoners. An experienced civil officer observed, "There is a great deal of laziness in it. It is far pleasanter to sit comfortably in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun hunting up evidence." This was a new view to me, but I have no doubt of its truth.' 1 Stephen, A History of the Criminal Law of England (1883), 442, note. Compare §§ 25

and 26 of the Indian Evidence Act (1872).

"And Fitzjames Stephen, who acted on this experience in drawing the Indian Evidence Act, was no softie, either before he became a judge or on the bench.

"Accordingly I adhere to the views expressed in Goldman v. United States, 316 U.S. 129, 136 [supra], that the Olmstead case should be overruled for the reasons set forth in the dissenting opinions in that case. These views have been strongly underlined by the steady increase of lawlessness on the part of law officers, even after Congress has forbidden what the dissenters in Olmstead found the Constitution to forbid.

"Even on the basis of the prior decisions of this Court, however, I feel bound to dissent. The Court seems not content with calling a halt at the place it had reached on what I deem to be the wrong road. As my brother Burton shows, the Court now pushes beyond the lines of legality heretofore drawn. Such encouragement to lazy, immoral conduct by the police does not bode well for effective law enforcement. Nor will crime be checked by such means."

And, Mr. Justice Clark, speaking for the Court, in Mapp v. Ohio, supra, said no longer ago than a little more than a year:

"There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine '[t]he criminal is to go free because the constable has blundered.' People v. Defore, 242 N.Y. [13], at 21, 150 N.E. [585], at 587. In some cases this will undoubtedly be the result. But, as was said in Elkins, 'there is another consideration—the imperative of judicial integrity' [Elkins v. United States], 364 U.S. [206], at 222 [80 S.Ct. 1437, 4 L.Ed.2d 1669]. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As

Mr. Justice Brandeis, dissenting, said in Olmstead v. United States, 277 U.S. 438, 485, (1928) [supra]: 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. * * * If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.' Nor can it lightly be assumed that, as a practical matter, adoption of the exclusionary rule fetters law enforcement. * * *

"The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restrains on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."

A reading of Taft's opinion in Olmstead leaves the strong conviction that he was moved by a reluctance to let a "conspiracy of amazing magnitude" go unpunished.

Is not the protection of the private thoughts and words of all the men, women and children of the nation from the agents of the government, who, if Olmstead is pushed to its bitter end, will act at their own discretion, the honest and

the dishonest, unauthorized and unrestrained by the courts, a matter of concern which is of infinitely greater magnitude? It was not solicitude for law breakers that caused the people of the United States to ordain the Fourth and Fifth Amendments as part of the Constitution.

Chief Justice Taft had said in Olmstead (pp. 462–463, 48 S.Ct. 567): "The striking outcome of the Weeks case and those which followed it was the sweeping declaration that the Fourth Amendment, *although not referring to or limiting the use of evidence in courts*, (emphasis supplied) really forbade its introduction if obtained by government officers through a violation of the Amendment." The Chief Justice said this had been "decided with great emphasis, and established as the law for the federal courts."

In 1961 the Court overruled its earlier decision in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and held that the exclusionary rule of Weeks was constitutionally required of the state courts as well as the federal courts. Mapp v. Ohio.

The significance of Mapp here is the Court's heavy reliance upon Boyd (367 U.S. pp. 646–647, 665, 662–663, 666, 81 S.Ct. 1684), upon a "liberal rather than a niggardly interpretation [of the Fourth and Fifth Amendments], (647 and 666, 81 S.Ct. 1697), upon a clear recognition that Weeks, and now Mapp, announce doctrine which is "constitutionally required—even if judicially implied—."

This is a far cry from the "narrow, literal construction of the search and seizure clause of the Fourth Amendment adopted in Olmstead", to use Justice Murphy's characterization (Goldman v. United States, 316 U.S. 129, 140, 62 S.Ct. 993, 999.)

Mapp is a strong and vigorous expression in this area. So too is Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), which forbids federal judicial use of evidence seized in violation of the Constitution by

state agents. And, a unanimous Court in Jones v. United States, 362 U.S. 257, 266–267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960), upset the rulings in several Courts of Appeals, the "prevailing view", and held anyone legitimately on the premises has standing to move to suppress, and said: "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him."

So, we come full circle from Boyd decided in 1885. Mapp is an extension of Weeks. It announces constitutional doctrine which is binding upon the states. Both Weeks and Mapp are liberal interpretations of the Fourth Amendment. In both a judicially implied doctrine is read into the Fourth Amendment; and both rest firmly upon the authority of Boyd. Olmstead, at least as an authority for narrow construction of the Fourth Amendment has been overruled. But, more than that, the language of the Fourth Amendment, "persons, houses, papers, and effects," was enlarged by the Court in Silverman so as to cover the hearing of an oral conversation, which also was held to be protected from "unreasonable searches and seizures."

There simply isn't anything left of the statement in Olmstead that a liberal construction to effect the purpose of the framers of the Constitution in the interest of liberty "can not justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight." It is no longer true that the search or seizure is to be of "material things" Olmstead, 277 U.S. p. 465, 48 S.Ct. p. 568. The spirit of Boyd, which could never be long daunted, has been marvellously refreshed.

The application of these principles to the case before us is clear. Silverman

decides it. Beyond that we need not go. To the suggestion that we broaden the scope of the Fourth Amendment to "amorphism" I say: It isn't necessarily so, heed the teaching of the common law process of deciding cases as they arise and read 3 Chancery Cases 1, 26. Two hundred and eighty years ago Lord Nottingham wrote: "Where will you stop if you do not stop here? I will tell you where I will stop: I will stop wherever any visible inconvenience doth appear; * * * the first inconvenience that ariseth upon it will regulate it."