Eugene Anthony NOLAN, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 9730.

United States Court of Appeals
Tenth Circuit.

Nov. 10, 1969.

Rehearing Denied April 16, 1970.

James L. Guilmartin and Stanley Jay Bartel, Miami, Fla. (Guy Johnson, New Orleans, La., Robert Rizley, Tulsa, Okl., Addison M. Bowman, with them on brief) for appellant.

K. Eric Gisleson and Edward T. Joyce, Dept. of Justice (Will Wilson, Asst. Atty. Gen., and Gerald E. McDowell, Dept. of Justice, with them on brief) for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and HILL, Circuit Judges.

MURRAH, Chief Judge.

Defendant Nolan was convicted at jury trial for conspiracy to use and the actual use of facilities in interstate commerce to carry on an unlawful gambling business in violation of 18 U.S.C. §§ 371 and 1952. On appeal, Nolan challenges the practices employed in the selection of the jury venire; the incriminating use of his federal wagering tax stamp; the prejudicial admission of the federal wagering tax stamp of his co-conspirator, Dale Hines; surveillance to obtain incriminating evidence; and asserts the compromise of his Fifth Amendment right to remain silent in order to support his Fourth Amendment motion to suppress; insufficiency of the evidence; prosecutorial misconduct; and improper sentencing.

### I. Challenge to the Venire

While not attacking the key man system employed in the Northern District of Oklahoma at the time of our case as illegal per se or intentionally discriminatory, Nolan does claim that the system had the operational effect of discriminatorily excluding lower educational and income groups and racial minorities. He contends that the key men or suggesters selected by the jury commission were not representative of a cross section of the community and that the instructions in the letter sent to them to use their "own good judgment" to select "good citizens" as prospective jurors added additional qualifications found and condemned in Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966) and Witcher v. Peyton, 405 F.2d 725 (4th Cir. 1969), and that, in any event, he was denied a fair evidentiary hearing upon these claims.

It is settled beyond doubt that the constitutional fair- and impartial-jury guaranty does not require that every economic, racial, or ethnic class shall be represented on every jury venire or panel. What it does require is that no such group shall be discriminatorily excluded. Consistent lack of proportional representation on the jury list may very well be cogent evidence of systematic exclusion. See Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Hernandez v. United States, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866

(1954); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Rabinowitz v. United States, supra; Bary v. United States, 248 F.2d 201 (10th Cir. 1957).

Since it is conceded that the so-called key man system is not per se discriminatory, our inquiry is whether the methods and practices employed were discriminatorily utilized here. Upon motion to quash the jury list, the court conducted a pretrial hearing in which the jury commissioner and court clerk described and explained in detail the method and manner in which the key men or suggesters were selected as well as the instructions given to them on how the prospective jurors were to be chosen.

These methods and practices may be summarized as follows: Every three or four years the court clerk sent letters asking for suggested names of possible jurors to all postmasters in the district, civic and professional clubs, each and every church listed in the telephone directory, labor unions and county agents of each county in the district. Other groups were contacted by telephone and the clerk also traveled to many towns in the district to "secure names from various groups that would represent a cross-section of the prospective jurors and as to the population and as to their occupation and as to the color and race * * *" Sometimes suggestions were made by the jury commissioners themselves, federal judges, their law clerks, and other federal employees.

When the suggested names were received, an administrative office questionnaire was sent to each prospective juror, asking for the usual biographical information and inquiring about any criminal record and the ability to read and write. See 28 U.S.C. § 1861. Race, religion, and economic status were not mentioned. When the questionnaires were returned, they were examined for juror disabilities and only statutory disqualifications were made.

The challenged instruction in the letter stated simply that the prospective jurors "should be good citizens and representative of the various interests in the community * * *. Please use your own good judgment." (R. 1327)

■ There is certainly nothing in this record from which it can be said that the suggesters did not fairly represent a cross section of the community. On the contrary, the organizational and group identity of many of the suggesters is strongly indicative of their heterogenity. Nor do we find anything in the instructions which can be construed to authorize the suggesters to set up their own standards for juror qualifications. Considered in the context in which the instructions were given, we believe they are susceptible to only one admonition, i. e., that the suggesters should use their best judgment in the selection of prospective jurors whom they believe to be fairly representative of the citizenry of the community in which they live. There can be no objection to the admonition to select good citizens so long as they are fairly representative of the community and this language was obviously intended to and did say no more. Cf. Hunt v. United States, 400 F.2d 306 (5th Cir. 1968); Rabinowitz v. United States, supra; Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966).

■ Nolan insists, however, that had he been permitted to do so, he could have shown by the testimony of the suggesters themselves that they construed their instructions to authorize them to exercise their "own good judgment" concerning qualifications in selecting "good citizens" as prospective jurors and thus establish their own standards without regard to statutory or constitutional requirements. Purposeful discrimination may not be assumed or merely asserted, i. e. see Swain v. Alabama, supra. It was incumbent upon Nolan to make some factual showing of racial, educational or economic disparity in the jury list as a basis for the interrogation of the suggesters concerning their interpretation of the instructions to use their best judgment to choose "good citizens" repre-

senting the various interests of the community. See Hunt v. United States, supra, distinguishing Rabinowitz v. United States, supra. In his motion to quash, Nolan asserted only conclusions of law without supporting affidavits, statistics or factual allegations showing any disproportionate representation or any irregularities in the practices used. At the outset of the evidentiary hearing the trial court cautioned Nolan's attorneys that "the Court is going to look to you for proof, with evidence of some support of these allegations and will determine by such proof and evidence how far this court will go into the hearing in depth." After hearing testimony from the court clerk, deputy clerk, and jury commissioner for over two days, which revealed no significant irregularities of any kind, the court ended the hearing. When counsel attempted to resort to the jury list apparently for the purpose of making a prima facie showing of racial or economic disparity, the trial court very properly suggested that the jury lists had been available to counsel for four months without any statistical or other factual data tending to show disproportionate representation. We think the trial court quite properly declined to permit counsel to launch what can only be called a fishing expedition.

## II. Incriminating Use of Nolan's Tax Stamp

Nolan's second claim is that the government's use of his federal wagering tax stamp filings at trial violated his Fifth Amendment privilege against self-incrimination. And see Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); United States v. Covington, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969); United States v. Freeman, 412 F.2d 1180 (10th Cir. 1969). Under the controlling rationale of these cases Nolan's tax stamp filings were compelled self-incriminatory statements and a properly asserted claim of privilege would shield him from criminal penalties for failure to comply with the tax laws on wagering. Marchetti, 390 U.S. at 48, 88 S.Ct. 697; Leary, 395 U.S. at 27, 89 S.Ct. 1532. Since then it has become clear that introduction of evidence of these filings at defendant's trial on charges of violation of 18 U.S.C. §§ 371 and 1952 would also have subjected defendant to a "real and appreciable risk" of self-incrimination. And see United States v. Freeman, supra; Nolan v. United States, 395 F.2d 283 (5th Cir. 1968). The filings were not, however, formally introduced into evidence and the question is whether the oblique references that were made to them were sufficient to create the required risk of self-incrimination and to entitle defendant to claim his Fifth Amendment privilege.

Defendant's possession of a tax stamp was referred to by the court and counsel for both sides and testified to by defendant's brother, Dr. Charles Nolan. The indictment listed the defendant's holding of a wagering tax stamp as one of the overt acts under the conspiracy count and this was read to the jury, without objection, by the court.

The central reference to the stamp came from defendant's brother, Dr. Nolan, who volunteered on both direct and cross-examination that one of his reasons for considering his brother a professional gambler was his possession of a wagering tax stamp. Dr. Nolan mentioned other reasons for his opinion but always returned to the stamp. On cross-examination, he said, "He owned these gambling establishments and—or he backed them rather, and he had a gambling stamp. That's what I mean." Several questions later he reiterated "So, consequently, anybody that holds a gambling stamp, in my opinion, is a gambler, and if you hold a gambling stamp, I think, in the public's eye you are considered a professional gambler and this is what I was pertaining to before the

Grand Jury." (R. 1030) No objection was made to any of this testimony.

Dr. Nolan's testimony was referred to by both sides in argument to the jury and the government emphasized it in its summary of the evidence. In its argument, the defense rhetorically asked the jury why the stamp had not been introduced and, in closing, the government explained its absence as an effort to avoid possible error under cases then pending in the Supreme Court. See Marchetti, 390 U.S. at 41, n. 7, 88 S.Ct. 697. Finally, the court devoted one sentence of its charge to the tax stamp issue, stating that possession of a wagering tax stamp did not excuse violations of state gambling laws. Counsel for Nolan felt this reference was unnecessary but did not object.

■ Considering these references to defendant's tax stamp both for their individual and cumulative effect in the course of a four day trial, we must conclude that sufficient reference was made to subject defendant to a substantial risk of self-incrimination. The privilege may be violated in other ways than by introduction of the self-incriminatory statements, Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and there was a real danger here that these references might become "a significant 'link in a chain' of evidence" tending to establish Nolan's guilt. Marchetti, 390 U.S. at 48, 88 S.Ct. at 703.

■ Although the references to Nolan's tax stamp were sufficient to entitle him to claim the Fifth Amendment privilege it was incumbent upon him to make a timely and proper assertion of the privilege. Marchetti, 390 U.S. at 61, 88 S.Ct. 697; Haynes, 390 U.S. at 100, 88 S.Ct. 722; Leary, 395 U.S. at 27, 89 S.Ct. 1532; Covington, 395 U.S. at 59–61, 89 S.Ct. 1559; Freeman, 412 F.2d at 1181. As we have seen, no assertion of the privilege was made in the trial court. The issue is first raised on appeal. Nolan seeks to excuse his failure to raise the privilege on the rationale

of Grosso. In that case, the Supreme Court excused a defendant's failure to raise his privilege as a defense to an occupational wagering tax prosecution since United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953) and Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955) were still good law at the time of his trial. Because there was no evidence of waiver other than the failure to assert the privilege and because the defense of privilege would prevail in the trial court, the Court reversed the judgment in its entirety. Grosso, 390 U.S. at 71–72, 88 S.Ct. 709.

We think our case differs from Grosso because, in our situation, Nolan's counsel was aware that the availability of the privilege under these circumstances was being actively litigated and he was thus charged with a duty to anticipate a favorable decision and to make his record accordingly. A review of the chronology of the events leading to trial of this case demonstrates defense counsel's knowledge of the likelihood of the availability of the privilege.

On March 2, 1966, the Supreme Court granted certiorari in the case of Costello v. United States, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966), limited to the following issues:

"1. Do not the federal wagering tax statutes here involved violate the petitioner's privilege against self-incrimination guaranteed by the Fifth Amendment? Should not this court, especially in view of its recent decision in Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), overrule United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953) and Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955)?"

On October 10, 1966, certiorari was granted in Grosso v. United States, 385 U.S. 810, 87 S.Ct. 47, 17 L.Ed.2d 53 (1966). On January 9, 1967, after Costello's death, the Supreme Court granted certiorari in the case of Marchetti v.

United States, 385 U.S. 1000, 87 S.Ct. 698, 17 L.Ed.2d 540 (1967), limited to the same issues as in Costello. On January 17 and 18, 1967, the Court heard argument in both the Grosso and Marchetti cases.

Four months later, on May 25, 1967, at the trial of defendant the prosecution introduced into evidence the wagering tax stamp and tax filings of Dale Hines, the alleged co-conspirator with Nolan. Defense counsel objected to their introduction because of the two cases then pending in the Supreme Court which, in counsel's words, raised the question "whether or not this manner of proving a man a gambler is constitutional or not. Whether or not he is being forced to admit that he is a gambler. This is a question before the Supreme Court which may be decided at any moment." (R. 1014–15)

It is thus quite apparent that both sides tried this case in the shadow of Marchetti and Grosso and their probable consequences. The government, aware of the possibility of error in introducing the stamp, was not disposed to offer it formally into evidence; instead it sought to bring the stamp before the jury by way of references to it in testimony and argument. It may be that the defense was hopeful that the government might formally introduce or make more direct references to the stamp, laying the ground for error depending on the outcome of Grosso. This strategy is indicated by the closing argument, asking the jury why the stamp had not been introduced and provoking a further reference and explanation of its absence from the Government. For purposes of our case, it is sufficient to say that the failure to assert the privilege sometime during the trial of the case can be plausibly attributed to calculated trial strategy. In the circumstances, we conclude that its assertion for the first time on appeal is too late and the privilege is deemed to have been waived.

### III. Alleged Denial of Confrontation and Cross-Examination

Nolan makes brief reference to the admission of Hines' tax stamp filings, contending for the first time on appeal that they were hearsay and violated his confrontation and cross-examination rights under Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In Douglas, a convicted co-defendant whose appeal was pending invoked the privilege against self-incrimination when called by the prosecution. The prosecutor was then permitted to treat the co-defendant as a hostile witness and "[u]nder the guise of cross-examination to refresh [the co-defendant's] recollection, the Solicitor purported to read from the [confession of the co-defendant], pausing after every few sentences to ask * * * in the presence of the jury, 'Did you make that statement?' Each time, [the co-defendant] asserted the privilege and refused to answer, but the Solicitor continued this form of questioning until the entire document had been read." Douglas, 380 U.S. at 416–417, 85 S.Ct. at 1075. The Court ruled that the Solicitor's recitations may have been equivalent to testimony by the co-defendant in the jury's mind and that Douglas' inability to cross-examine the co-defendant "to test the truth of the statement itself" denied Douglas his right of confrontation. Id. at 420, 85 S.Ct. at 1077.

In Bruton, a statement by a co-defendant inculpating Bruton was admitted as evidence against the confessor but the jury was instructed to disregard it as against Bruton. The co-defendant did not take the stand and was therefore not subject to cross-examination. The Supreme Court ruled that the instruction to disregard the confession was ineffectual and that the refusal of the co-defendant to testify robbed defendant of his constitutional right of confrontation and cross-examination.

The Hines' filings were obviously offered and admitted to prove the conspiracy count in the indictment, not the substantive offense. And, as we have seen, Nolan's objection went to the question of self-incrimination, i. e., "forcing him to admit that he was a gambler." When the court inquired whether Nolan had standing to object to admission of Hines' tax stamp filings, counsel replied, "He has standing to object to anything prejudicial in his case which is in fact establishing an element of conspiracy, to-wit: the fact that Hines, a co-conspirator, was in fact a gambler." (R. 1015) Liberally construed, we take it that the objection was intended to challenge the competency of the filings to prove an essential element of the conspiracy. There was evidence tending to show continuing telephonic communications between the Hines' place of business in Tulsa and Nolan's place of business in Baton Rouge.[1] And there was record evidence that wagering activities were carried on contemporaneously at both places. On this predicate, the evidence was not objectionable hearsay, Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); but see also Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), and was undoubtedly competent to prove the conspiracy, subject, of course, to the right of confrontation and cross-examination.

After the filings were identified and admitted and the Government's case was closed, Hines was called as a witness for the defense by Nolan and was asked, "[D]o you know Joe Rabino?" to which he pleaded the Fifth Amendment. His plea was ultimately sustained without Hines being examined in any manner.[2]

1. During the period of the conspiracy fifty calls were made from the phone in Hines' place of business to Nolan's number in Baton Rouge. In addition there was record evidence that during the conspiracy period approximately 300 calls were received either by Nolan's number in Baton Rouge or Hines' number in Tulsa and charged to three different credit cards issued in fictitious names for the account of Gil Beckley and paid for by him. A former telephone company employee who obtained the credit cards for Gil Beckley testified that at one point users of one of the cards were transposing its numbers, making correct billing difficult. At Mr. Beckley's suggestion he called a "Gene" or "Eugene" in Baton Rouge to explain the proper use of the card for telephone accounting purposes. Only 4 of these calls were directly traced from either Nolan's exchange in Baton Rouge to Hines' number or vice versa. But approximately 195 of them were identified as originating in the city of Baton Rouge and going to Hines' number in Tulsa, or originating from the city of Tulsa and going to Nolan's number in Baton Rouge. The remainder of the 300 credit card calls were either to Hines' or Nolan's number from other cities around the country.

Records seized in a search of Hines' premises listed Nolan's Baton Rouge telephone number in juxtaposition with the number 19 and further identified the number 19 with so-called "bottom sheets", reflecting gambling transactions between Hines' place of business and number 19. A government expert was permitted to testify that in gambling transactions of this kind the names of "players or * * * agents" were frequently abbreviated by numerical designations known as codes. Under the instant instructions of the court, the jury was apparently left to infer whether Nolan was sufficiently identified with code number 19.

2. The record reveals the following:
"Q. Mr. Hines, do you know Joe Rabino? A. Your Honor, I take the Fifth Amendment.
 * * * * *
The Court: The Court can't compel Mr. Hines to testify if he doesn't desire to.
Mr. Rizley: Well, Your Honor, in the Fifth Amendment there are several provisions under the Fifth Amendment.
 * * * * *
The Court: There has been enough presented to the Court for my ruling.
 * * * * *
Mr. Rizley: There may be questions which could be posed to this witness which would not be answered by this witness insofar as his taking the Fifth Amendment. I believe the law is that—
[The witness was then recalled to find out if he was going to take the Fifth Amendment for the whole case whereupon the Court inquired:]
You have taken the Fifth Amendment in connection with a couple of ques-

It may be conceded that Hines' filings are analogous to the inculpatory evidence in both Douglas and Bruton and consequently subject to the same Constitutional safeguards with respect to confrontation and cross-examination. And see Evans v. Dutton, 400 F.2d 826 (5th Cir. 1968), prob. juris. noted, 393 U.S. 1076, 89 S.Ct. 862, 21 L.Ed.2d 770 (1969). And it may also be conceded that Hines' plea of the privilege operated to deprive Nolan of the right to confront and cross-examine Hines with respect to his filings and the use of his stamp. But, even so, it was surely incumbent upon Nolan to timely assert the right of confrontation and to complain of its denial. Cf. Douglas, 380 U.S. at 420, 85 S.Ct. 1074 (Part II of the opinion).

When the filings were identified and offered in evidence and Nolan objected on the grounds of inadmissibility to prove the offense, he could not anticipate Hines' plea and therefore cannot be charged with a duty to assert the right of confrontation at that stage of the proceedings. But when the Government's case was in and Hines was called as a defense witness, his plea certainly apprised Nolan that he would be unable to examine him either directly or indirectly with respect to the inculpatory evidence, i. e., the tax stamp filings. There is nothing in the record to indicate that Hines was called for cross-examination or as a hostile witness and nothing to apprise the trial court of a claim that Hines' plea worked a deprivation of Nolan's constitutional right of confrontation. After the court had sustained the plea and the witness was excused, the defendant rested his case without moving for a directed verdict or mistrial or in any way complaining of a denial of confrontation. In these circumstances we hold that if the Hines' plea deprived Nolan of his right to examine or cross-examine Hines with respect to his tax stamp filings the right was effectually waived by failure to complain of it after the fact.

### IV. Electronic Surveillance

Defendant's fourth allegation of error is that the Government's evidence at trial was tainted by illegal electronic surveillance of the defendant by the FBI, the IRS, and the Pacific Telephone and Telegraph Co. After alleging the existence of illegal surveillance in a pretrial motion to suppress (R. 14) the defendant was entitled to inspect all recordings and transcripts made of his conversations. Alderman v. United States, 394 U.S. 165, 181, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). With exceptions to be noted later, the Government provided defendant with all relevant tapes. After inspecting this material, the burden was on the defendant to prove that an illegal electronic surveillance of himself had occurred. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Once this initial burden is met, the ultimate burden of persuasion in showing freedom from taint and reliance on independent sources is on the Government. Id.; Cf. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). At the same time defendant is required to "go forward with specific evidence demonstrating taint." Alderman v. United States, 394 U.S. at 183, 89 S.Ct. at 972; Nardone v. United States, 308 U.S. at 141, 60 S.Ct. 266.

The defendant raised the issue of illegal surveillance twice in pretrial mo-

tions put to you and counsel wants to ask you several other questions in connection with the defense of this case, as far as the defendant Eugene Nolan is concerned. The Court will inquire of you if you intend to take the Fifth on any and all questions that might be pertinent in this case.

The Witness: Yes, sir.
The Court: Very well.

Anything further, now?
Mr. Rizley: We have nothing further of this witness, if Your Honor has so ruled.
The Court: All right. Call your next witness.
You may step down
(Witness excused)
Mr. Guilmartin: The defendant rests, Your Honor."

tions, first in a motion to suppress and later in motions to quash the indictment and to dismiss. On the first motion, after a hearing, the court suppressed thirty-five tapes made by the FBI and IRS but declined to suppress the tapes made by the telephone company. The court also found that no tainted evidence derived from the suppressed tapes was used in returning the indictment (though it is apparent the court was not convinced of the illegality of the tapes). The court also denied the motions to quash and to dismiss, after a second full hearing on the issue of illegal surveillance, holding that the defendant had failed to meet his initial burden under Nardone of showing illegal surveillance involving himself and never reaching the issue of taint except as to the IRS tapes.

■ In order to simplify our problem, we will discuss each category of allegedly illegal surveillance separately. The first involves an alleged wiretap by Special Agent Owen Burke Yung of the IRS in Miami, Florida in 1962. The tapes compiled by Yung were erased and reused and were unavailable to the defendant. However, Agent Yung testified that the phone he tapped did not belong to defendant and that he did not know of or participate in any illegal eavesdropping on this defendant. Defendant provided no evidence to support his assertions that his conversations were monitored and we conclude that he failed to prove he was the subject of surveillance by Agent Yung. A discussion of possible taint thus becomes unnecessary. See Fullbright v. United States, 392 F.2d 432, 435–436 (10th Cir. 1968), cert. denied 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101; United States v. Thompson, 409 F.2d 113, 117 (6th Cir. 1969); United States v. Masterson, 383 F.2d 610, 614 (2d Cir. 1967); Murray v. United States, 333 F.2d 409, 411 (10th Cir. 1964), vacated on other grounds, 380 U.S. 527, 85 S.Ct. 1345, 14 L.Ed.2d 266 (1965); United States v. Desist, 277 F.Supp. 690 (S.D.N.Y.1967), aff'd 384 F.2d 889 (2d Cir. 1967), aff'd on other grounds, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

■ Defendant also alleged that IRS Agent Nauborn Perry conducted an illegal wiretap involving him in New Orleans in 1959. The tape of this surveillance could not be found, but a transcript was made available to the defendant. Nolan placed in evidence quantities of testimony from the trial of United States v. Lassoff, Crim. No. 28247 (E.D.La. 1962), in which he was a defendant in 1962 and at which the Perry tapes were played. Although the testimony was offered to show that defendant was the subject of this surveillance, it shows that the phone tapped was not defendant's and was not on defendant's premises. And Agent Perry did not identify defendant as one of those whose voice was recorded. The only evidence tying defendant to the tapes was the name "Gene" appearing in the transcript of the tape and defendant's testimony that he had recognized his own voice on the tapes at the 1962 trial. Under these circumstances, it was reasonable to reject Nolan's testimony and to find he had failed to prove his relation to the alleged wiretap.

■ We conclude that defendant has also failed to show the illegality of the FBI surveillance in 1964. Although these tapes were suppressed initially, the court reserved the question of their legality. (R. 525) In response to defendant's later motions to quash the indictment and dismiss, the court found the FBI installation to have been a legal eavesdrop. (R. 776) The FBI agent who installed the listening device testified at the first hearing that a contact microphone was applied to the walls of the hotel rooms adjoining defendant's and that no penetration had occurred. Under Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), such an installation was not illegal. The defendant claims that the subsequent case of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), rendered after defendant's

conviction but during his appeal, makes the tapes illegal. But Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), has held the Katz rule inapplicable to eavesdropping occurring prior to the date of the Katz decision. Since the FBI tapes were made prior to Katz and the method of obtaining them was acceptable under Goldman, Katz is inapplicable.

■ The fourth category consists of tapes made by the IRS of the defendant in two different locations in 1964. These tapes were made by wall-penetrating devices and we think their illegality under Goldman v. United States, supra, was sufficiently established by the testimony of the agents who installed them. It is also clear that defendant was a subject of surveillance. We think, however, the Government has shown that its case was free from taint resulting from this surveillance. The testimony of the agent in charge of the surveillance and the playing of one tape in court showed that nothing of value could be derived from these tapes. In these circumstances, we do not think the failure of the Government to produce one of the six tapes was so serious as to require a further hearing. Nor do we think it was error for the lower court to refuse to allow defendant to improve the sound quality of the IRS tapes when the Government filed an affidavit and the recording officer testified that the tapes were in their original state and that no effort had been made to improve their quality.

The final category of electronic surveillance is the tapes which were apparently made by Pacific Telephone & Telegraph as part of an investigation of illegal use of its long distance lines. The defendant attempts, in his brief, to tie together these tapes, similar telephone monitoring by the Southern Bell Telephone in Louisiana, and telephone monitoring by IRS Agent Nauborn Perry in Louisiana. There is no basis in the record to support this theory and we disregard it.

We must initially decide whether the court was correct in its finding of legality, remembering that the burden was on the defendant to prove illegality. Defendant first contends that the tapes were obtained in violation of the fourth amendment. Katz is the only basis on which the Fourth Amendment's protections might be extended to cover telephone monitoring (assuming government cooperation with the telephone company) and it is unavailable to the defendant provided the tapes were secured in accordance with applicable legal standards (in this case 47 U.S.C.A. § 605 (1962, as amended, Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351 (June 19, 1968, 82 Stat. 197)). See Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

The legality under § 605 of the use of telephone company monitoring records at trial has been upheld on several theories. The older theory is that illegal users of the telephone company's facilities are not entitled to the protection of § 605 for their communication. In Brandon v. United States, 382 F.2d 607 (10th Cir. 1967), we held that § 605 was not violated by the use of a telephone company's monitoring tapes to secure an indictment for violations of 18 U.S.C.A. §§ 371 and 1343 (1966) (conspiracy and actual transmission of signals by wire in interstate commerce to defraud telephone company). We said there that § 605 was "adopted by Congress for the protection of authorized users of telephonic or radio facilities; it was not intended as a refuge for the wrongdoer who uses the telephone in a scheme to violate the wire fraud statute." Id. at 611. This interpretation rests both on implied consent to company attempts to bill the user properly, Id. at 611, and on judicial interpretation of the intended scope of the legislation. United States v. Sugden, 226 F.2d 281 (9th Cir. 1955), aff'd per curiam, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449.

■ There is an equally convincing interpretation of § 605 upholding

the use of the tapes against recipients, as well as senders, of illegal calls. The first clause of that section, unlike the second, permits the divulgence of communications intercepted in the course of employment in certain limited circumstances, including "in response to a subpoena * * * or on demand of other lawful authority." The perpetration of toll frauds on the telephone company's direct dialing and billing machinery has required monitoring of telephone lines by employees to detect the illegal users and to fulfill the company's statutory duties to the Government and to its customers. Hanna v. United States, 404 F.2d 405 (5th Cir. 1968). The monitors may be considered employees within the first clause and it is our opinion that divulgence in the manner outlined there is not impermissible. Because of our reading of the first clause of § 605 we need not consider the alternate theory that telephone monitoring by the company to detect toll frauds constitutes an implied exception to the second clause of § 605. See Bubis v. United States, 384 F.2d 643 (9th Cir. 1967).

 The only question under this theory is whether the company monitoring was disclosed in the manner required by § 605. The record reveals that the tapes were subpoenaed for this trial from another court where they had been introduced into evidence. There is no evidence in the record as to the manner of original disclosure of this information to the Government. As we have seen, the defendant has attempted in his brief to show cooperative monitoring by the Government and phone company. The record references in defendant's brief are to the trial record of United States v. Lassoff, Crim. No. 28247 (E.D.La. 1962) and have no apparent bearing on the tapes in question. There was no attempt here to trace the origins of these tapes by interrogatories or otherwise. In the absence of evidence from the defendant as to the manner of original disclosure by the telephone company, we must hold that Nolan has failed to satisfy his burden of showing illegality under

Nardone. The absence of evidence as to the circumstances of the telephone company's disclosure distinguishes this case from Bubis v. United States, 384 F.2d 643 (9th Cir. 1967), where the court held tapes apparently resulting from the same surveillance inadmissible.

 Nolan also argues that use of telephone company toll records at trial and before the Grand Jury to show calls between his phone and Hines' were in violation of the Fourth Amendment and 47 U.S.C.A. § 605 (1967). We fail to see how the Fourth Amendment is applicable to the keeping of telephone company records. There is no suggestion that these records represent anything other than records normally kept in the ordinary course of business on all customers' phones. No showing of government involvement in the keeping of these records has been made, Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159 (1921); and, as we have noted, Desist makes the Katz rule inapplicable to these records insofar as it applies the Fourth Amendment to electronic surveillance.

 The § 605 objection is based on the assumption that these toll records were divulged to the government by the company in violation of the first clause of that section or were obtained by interception and divulgence contrary to the second clause. The trial court apparently admitted the records under the rationale of United States v. Gallo, 123 F. 2d 229 (2d Cir. 1941), which rejected a similar claim of illegal divulgence and interception under the second clause. We agree that the second clause does not prohibit the use of these records.

 Assuming the applicability of the first clause of § 605 to these records, Di Piazza v. United States, 415 F. 2d 99 (6th Cir. 1969), petition for cert. filed, 38 U.S.L.W. 3342 (U.S. Dec. 17, 1969); Contra, United States v. Covello, 410 F.2d 536 (2d Cir. 1969), cert. denied, 397 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (U.S. Oct. 20, 1969), rehearing denied, 397 U.S. 929, 90 S.Ct. 897, 25 L.Ed.

2d 110 (U.S. Feb. 24, 1970), the burden was on Nolan to show that they were disclosed in a manner violative of that clause. Nardone v. United States, supra. The record plainly shows that these toll records were produced in court pursuant to subpoena duces tecum but is silent as to the manner in which the existence of these records first came to the attention of the government. As we said in connection with the disclosure of the telephone company tapes, in the absence of some evidence of illegal divulgence or interception it is enough that they were produced "in response to a subpoena issued by a court of competent jurisdiction." 47 U.S.C.A. § 605.

█ Since we have decided that Nolan failed to prove the illegality of the use of the toll cards or telephone company tapes, we may summarily dispose of his objection to the trial court's denial of access to the names and testimony of the Grand Jury witnesses for the purpose of proving taint. In any event, Nolan's desire to show that tainted evidence had reached the Grand Jury did not constitute a "particularized need." United States v. Procter & Gamble, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Melton v. United States, 398 F.2d 321 (10th Cir. 1968). This situation is clearly distinguishable from Government refusal to give a defendant access to records of electronic surveillances involving him. See Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968).

Nolan's final claim on this subject is that he was denied a full hearing on the matter of illegally obtained evidence and that the trial court's action violated the standards set forth in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Kolod v. United States, supra; and Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The scope of the adversary hearing required by Alderman and Kolod was more closely defined in the recent case of Taglianetti v. United

States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). In holding that the trial court properly double-checked government records *in camera* to be sure that all records containing defendant's voice were turned over to him the Supreme Court stressed, "Nothing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, ante, p. 165, requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance. * * * Here the defendant was entitled to see a transcript of his own conversations and nothing else. He had no right to rummage in government files." Id. at 317, 89 S.Ct. at 1100–1101. And see United States v. Alderisio, 424 F.2d 20 (10th Cir. 1970).

█ The trial court devoted approximately eight days to a pretrial conference and hearings involving illegal wiretaps and eavesdropping. Testimony was received from nine witnesses, including the FBI and IRS agents who installed the equipment producing these tapes, the special agent in charge of the FBI in Oklahoma, the Oklahoma IRS agent in charge of the investigation, and IRS Agent Yung who allegedly wiretapped Nolan in Miami, Florida. The defendant was given the opportunity to listen to all tapes produced by the Government, to transcribe relevant portions of the tapes, and to make copies of certain of the tapes. In spite of all this, defendant was unable to prove the illegality of some of the surveillances or that others involved him. In the absence of such proof by the defendant, the trial court was acting within its discretion in ending the adversary hearing where it did, especially where the Government made a strong affirmative showing of legality and immateriality.

## V. Alleged Compromise of Fifth Amendment Rights

█ At the hearing on his motion to dismiss Nolan sought to testify that the allegedly illegal Perry tapes previously discussed contained his voice. Prior

to that testimony, the court had warned him that any statement he made could be used against him. Nolan now suggests that this warning was "the kiss of death", requiring reversal under Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In Simmons, the defendant testified in support of a motion to suppress that he owned an item which had been seized by the police and found to contain incriminating evidence. The motion to suppress was denied and the defendant's testimony was later used against him at trial. The Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394, 88 S.Ct. at 976. The ownership testimony was "an integral part" of his Fourth Amendment claim because it gave the defendant standing to contest the police seizure of the item and the Court held this testimony inadmissable against him at trial on the issue of guilt, unless he made no objection. But we do not think reversal is justified where, as here, it is clear that the warning did not prevent the defendant from testifying fully and that no use was made of the testimony against the defendant at trial. It is clear beyond doubt that Nolan's Fifth Amendment rights, unlike Simmons', were not compromised in any way.

### VI. Incompetent Prejudicial Evidence and Prosecutorial Misconduct

It is suggested that evidence associating Nolan in the conduct of gambling activities with Gil Beckley, who was neither a co-conspirator nor named in the bill of particulars, was incompetent and prejudicial error and that the trial court should have sustained defendant's motion for mistrial.

In accord with the rule announced at the beginning of trial as to identification of exhibits, a great number of exhibits were identified for the record; some were ultimately admitted over defense objections; some were withdrawn on motion of the prosecution without having been admitted in evidence or shown to the jury. Three exhibits tending to associate Beckley and Nolan in gambling activities were withdrawn without the jury having seen them.[3]

As we have seen (Footnote 1), the Government's evidence associated Gil Beckley with the Nolan-Hines transactions through the use of the Beckley telephone credit cards. The three fictitious credit cards issued to Beckley's account and the summaries of the calls charged to these cards and paid for by Beckley, 2000 of which were charged to one card— Tulsa Manufacturing Co., were introduced over defense objections. Among these calls were the approximately three hundred calls which were received at either Hines' number in Tulsa or Nolan's number in Baton Rouge.

Cross-examination established that the government witness who made the summaries had investigated Beckley's gambling activities and that in connection with this investigation ten or twelve people in different parts of the country had also been investigated and that these ten or twelve persons had been identified "as suspected people" whose "names were known." The witness was specifically asked to state just the number and not the names of these persons. On redirect the witness was asked to state the names and occupations of those ten or twelve persons. Over defense objections the witness was permitted to name the persons and to state that each was a known gambler on the grounds that it was proper redirect "in as much as you brought it up."

The defendant thereupon moved for a mistrial on the grounds that Beckley

---

3. Government exhibits 91, 103 and 104, seized in a search of Gil Beckley's premises, were withdrawn on motion of the prosecution and the jury was so instructed. By these exhibits the Government had hoped to prove that Nolan and Beckley engaged in large gambling transactions together.

and three others had been recently convicted and sentenced in Miami and that the fact had received widespread notice and that Beckley had been identified as a "kingpin" in the gambling business. The court observed that in the first place there was nothing in the record to indicate that Beckley's conviction as a "kingpin" gambler had in any way been brought to the attention of the jurors, but that even so, Beckley's conviction did not exonerate Nolan. The court's final ruling was to the effect that although the indictment was confined to the Nolan-Hines transaction to and from Baton Rouge and Tulsa, it was competent to show their connection with other gambling activities and that the Beckley credit card transactions were competent for that purpose.

We agree with the trial court that the Beckley credit card transactions were competent proof of the alleged conspiracy. Nor can we say that in the context of the case the defense counsel did not open the door wide enough to justify the identification of the 10 or 12 persons whose names were associated with the Beckley credit card arrangement. See Kayser v. United States, 394 F.2d 601 (8th Cir.); and cf. United States v. Corrigan, 168 F.2d 641 (2nd Cir.). Certainly we cannot say that the trial court abused its discretion for the sake of completeness.

Nolan charges the government prosecutor with misconduct in promising in his opening statement to prove the professional status of Nolan's gambling activities by connecting him with another alleged gambler, i. e. Beckley, then failing to produce such proof and failing to correct any impression of such a connection. He also contends that evidence which was identified only as the product of a search of Beckley's premises and never further explained or passed to the jury before being withdrawn might have been erroneously interpreted by the jury as proof of the initial promises. This situation clearly differs from Reeves v. Warden, Md. Penitentiary 346 F.2d 915 (4th Cir. 1965), where the misleading effect of the prosecutor's introductory remarks concerning the significance of evidence actually introduced as proof of the defendant's guilt was never corrected. Here the prosecution said it would prove certain facts but failed to do so after and adverse trial court ruling and subsequently noted the failure in its closing argument (as indeed did defense counsel). Any possible confusion created by the unfulfilled statement was thus corrected. We also reject Nolan's theory that the evidence identified and withdrawn without ever being presented to the jury could have misled or confused them, especially after the closing statements by both sides.

### VII. Insufficiency of the Evidence

Considering all of the evidence in the light most favorable to the prosecution, O'Neal v. United States, 240 F.2d 700 (10th Cir. 1957); Collins v. United States, 383 F.2d 296 (10th Cir. 1967); Osborn v. United States, 391 F.2d 115 (10th Cir. 1968), including the references to Nolan's tax stamp, we think there was ample evidence to support the jury's verdict. We reject Nolan's claim of insufficiency. As to the conspiracy count, we think the "circumstances, acts and conduct of the parties" support the conclusion that an unlawful agreement existed. Jones v. United States, 251 F.2d 288 (10th Cir. 1958); Jones v. United States, 365 F.2d 87 (10th Cir. 1966); Jordan v. United States, 370 F.2d 126 (10th Cir. 1966).

### VIII. Consecutive Sentencing

Nolan's final contention is that it was improper for the trial court to sentence him to consecutive sentences for violation of § 1952 and conspiracy to violate § 1952 because these offenses are within the exception to the prosecution's normal right to charge both a substantive of-

fense and a conspiracy and because the consecutive sentences are double punishment for a single crime.

 The exception to the general rule that conspiracy is a different offense from the substantive crime involves "crimes that cannot be committed except by the concerted action of at least two persons, and of such a nature that the immediate effect of their consummation reaches only the participants therein, so that the conspiracy to commit them is in such close connection with the objective offense as to be inseparable from it." Curtis v. United States, 67 F.2d 943, 947 (10th Cir. 1933). Violation of § 1952 is obviously not within this exception.

 We also reject Nolan's contention that consecutive sentences constitute double punishment for the same crime. The test of the identity of offenses is "whether each count requires proof of a fact or element not required by the other." Doherty v. United States, 193 F.2d 487 (10th Cir. 1951). The test does not turn on the identity of evidence actually produced on both counts, but on whether the same evidence is required to prove the two offenses. Beacham v. United States, 218 F.2d 528, 529 (10th Cir. 1955); Doherty v. United States, 193 F.2d 487 (10th Cir. 1955). The fact that the acts constituting the substantive offense also may be pleaded and proven as acts done in furtherance of the conspiracy is not determinative of their identity. See Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Harris v. United States, 359 U.S. 19, 23–24, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959); Ebeling v. Warden, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915); Carter v. United States, 333 F.2d 354 (10th Cir. 1964); Jordan v. United States, 370 F.2d 126 (10th Cir. 1966). Accordingly, it was permissible for the trial court to impose consecutive sentences for the conviction.

Judgment affirmed.